

# Fourth Court of Appeals
## San Antonio, Texas

### OPINION

No. 04-12-00852-CV

Jerry L. **HAMBLIN** and Ricochet Energy, Inc.,
Appellants

v.

Thomas A. **LAMONT**,
Appellee

From the 111th Judicial District Court, Webb County, Texas
Trial Court No. 2008-CVF-000665-D2
The Honorable Joe Lopez, Judge Presiding

Opinion by:    Patricia O. Alvarez, Justice
Dissenting Opinion by:  Rebeca C. Martinez, Justice

Sitting:       Rebeca C. Martinez, Justice
               Patricia O. Alvarez, Justice
               Luz Elena D. Chapa, Justice

Delivered and Filed:  December 11, 2013

REVERSED AND RENDERED

Jerry L. Hamblin and Ricochet Energy, Inc. appeal a summary judgment, rendered in favor

of Thomas A. Lamont, enforcing a contractual indemnity provision.  We reverse the judgment of

the trial court and render judgment in favor of Jerry L. Hamblin and Ricochet Energy, Inc.

### FACTUAL AND PROCEDURAL BACKGROUND

Because many of the historical facts in this case are set forth in our previous opinion,

*Lamont v. Vaquillas Energy Lopeno Ltd., LLP*, No. 04-12-00219-CV, 2013 WL 5228500 (Tex.

App.—San Antonio Sept. 18, 2013, no pet. h.), we need not repeat them here.

This current cause of action stems from a series of agreements entered into between Jerry L. Hamblin and Thomas A. Lamont. In 1996, Hamblin and Lamont formed Ricochet Energy, Inc., an oil and gas development company. Hamblin and Lamont each owned 50% of the shares and were the only directors of the company. In August of 2006, Lamont notified Hamblin that he wanted to separate from Ricochet.

## A.     The Master Agreement

The parties ultimately negotiated two separation agreements: (1) an agreement dividing Ricochet's oil and gas prospects (the Letter Agreement); and (2) a Master Agreement to Sell, Transfer, Assign and/or Dissolve Certain Business Interests (the Master Agreement). The Letter Agreement, attached and incorporated into the Master Agreement, identified the "Undeveloped Prospects" to which Lamont had a right to participate in the subsequent wells. The Letter Agreement also included notarized disclosure statements from Ray Gallaway, Ricochet's general counsel, and Hamblin warranting that the list of prospects was "a true, correct, complete and accurate listing of all such 'Undeveloped Prospects' pursuant to the Master Agreement." Under the Master Agreement, Lamont sold and transferred his Ricochet shares to Hamblin while retaining a 50% interest in certain ongoing Ricochet leases and Undeveloped Prospects. The Master Agreement also permitted Lamont to compete against Ricochet in pursuing other interests not specifically identified as an Undeveloped Prospect.

The agreements were dated February 15, 2007, executed on February 16, 2007, and made retroactive to December 31, 2006. Also on February 16, 2007, Lamont tendered his resignation as director, officer, and chief operating officer retroactively to December 31, 2006. Hamblin and Lamont initialed each page of the Master Agreement, which was drafted by Ricochet's general counsel, Ray Gallaway. During the separation negotiations, Gallaway served as both Ricochet's and Hamblin's lawyer for purposes of reviewing and revising the Master Agreement.

The Master Agreement also contained a series of provisions indemnifying Lamont against unknown liabilities. The indemnity provisions stipulate the parties' intent "to provide as broad of an indemnity as possible and all ambiguity as to whether Hamblin and Ricochet Energy, Inc. owe the duty of indemnification shall be resolved in favor of providing the indemnity/indemnification."

**B.      The Vaquillas Lawsuit**

On March 4, 2008, Vaquillas Energy Lopeno Ltd., LLP and JOB Energy Partners II, Ltd. sued Lamont, and others, alleging misappropriation of their trade secret, conversion, tortious interference with existing contracts, unjust enrichment, and conspiracy. The trade secret in question was a detailed seismic map of the Lopeno Prospect Gas Reservoir referred to as the Treasure Map. Vaquillas and JOB asserted Lamont wrongfully utilized the Treasure Map to lease the El Milagro property and develop the El Milagro wells, in direct competition with Ricochet.

The jury found that Lamont misappropriated Vaquillas and JOB's trade secret and intentionally interfered with the Prospect Generation Agreements between Ricochet, Vaquillas, and JOB. The jury assessed compensatory damages against Lamont and his co-defendants. The trial court rendered judgment on the jury's verdict.

**C.      The Indemnity Lawsuit and Summary Judgment Proceedings**

Three weeks after being sued in the Vaquillas Lawsuit, Lamont made a demand on Hamblin and Ricochet to honor the Master Agreement's indemnity provisions and indemnify him from any liability imposed on him as a result of the Vaquillas Lawsuit. Hamblin and Ricochet refused to indemnify Lamont for his liabilities. Lamont subsequently filed the present action against Hamblin and Ricochet, alleging Hamblin and Ricochet failed to honor their indemnity obligations under the Master Agreement. Lamont sought a declaration that Hamblin and Ricochet were required to indemnify him as a matter of law. Both sides moved for partial summary judgment on the indemnity issue.

The trial judge presiding over the summary judgment proceedings also presided over the jury trial in the Vaquillas Lawsuit. The trial judge granted partial summary judgment in favor of Lamont and ordered Hamblin and Ricochet to indemnify Lamont for (1) "any amount of the judgment in the [Vaquillas Lawsuit] . . . for which Lamont is liable after appeals of that judgment are exhausted," (2) Lamont's attorney's fees and expenses incurred in defending and appealing the judgment in the Vaquillas Lawsuit, and (3) Lamont's attorney's fees incurred in enforcing Hamblin and Ricochet's duties of indemnity in the present case.

Hamblin and Ricochet's interlocutory appeal followed.

### INDEMNITY AGREEMENTS

"An indemnity agreement is a promise to safeguard or hold the indemnitee harmless against either existing and/or future loss liability." *Dresser Indus., Inc. v. Page Petroleum, Inc*., 853 S.W.2d 505, 508 (Tex. 1993); *accord Van Voris v. Team Chop Shop, LLC*, 402 S.W.3d 915, 918 (Tex. App.—Dallas 2013, no pet.). It is a "risk-shifting provision[ ] that, in the context of relieving a party of responsibility for its own negligence, [is] considered 'extraordinary.'" *Van Voris*, 402 S.W.3d at 918 (quoting *Dresser*, 853 S.W.2d at 508).

Indemnity agreements are construed under the normal rules of contract construction. *Gulf Ins. Co. v. Burns Motors, Inc*., 22 S.W.3d 417, 423 (Tex. 2000). Principles of contract law require courts to ascertain and give effect to the intentions of the parties as expressed within the four corners of the agreement. *See El Paso Field Servs., L.P. v. MasTec N. Am., Inc*., 389 S.W.3d 802, 805 (Tex. 2012); *Ideal Lease Serv., Inc. v. Amoco Prod. Co., Inc.*, 662 S.W.2d 951, 953 (Tex. 1983). It is the objective, not subjective, intent of the parties that controls, and the instrument alone is considered to express that intent. *Sun Oil Co. v. Madeley*, 626 S.W.2d 726, 731 (Tex. 1981); *see MasTec*, 389 S.W.3d at 805.

## A.    Lamont's Indemnity Agreement

The Indemnity Provisions in this case are found in the Master Agreement and provide as follows:

> In addition to the indemnification set forth in Sections in 3.03, 3.09 and elsewhere herein, Hamblin and Ricochet Energy, Inc. agree to INDEMNIFY Lamont against any and all liabilities, obligations or claims arising from any act, occurrence, omission or otherwise which occurs after the Effective Date of this Agreement and which in any way pertains to Ricochet Energy, Inc. and/or its operations, actions and inactions.  It is the intention of the Parties and Ricochet Energy, Inc. to provide as broad of an indemnity as possible and all ambiguity as to whether Hamblin and Ricochet Energy, Inc. owe the duty of indemnification shall be resolved in favor of providing the indemnity/indemnification.

> Additionally, Hamblin and Ricochet Energy, Inc. specifically, as of the Effective Date, retain and assume any and all obligations or liabilities arising pursuant to any contracts, vendor agreements, contractor agreements, loans or other agreements executed by, on behalf of or for the benefit of Ricochet Energy, Inc., except those obligations and/or liabilities created by Lamont as a result of Lamont acting outside the normal course and scope of his employment with the corporation or normal course and scope of his duties as an officer of the corporation.  Hamblin and Ricochet Energy, Inc. agree to INDEMNIFY Lamont against any and all liabilities, obligations or claims which in any way relate to the assumed and retained obligations and liabilities specified herein.  It is the intention of the Parties and Ricochet Energy, Inc. to provide as broad of an indemnity as possible and all ambiguity as to whether Hamblin and Ricochet Energy, Inc. owe the duty of indemnification shall be resolved in favor of providing the indemnity/indemnification.

The parties characterize these indemnity provisions respectively as the Prospective Indemnity and the Retrospective Indemnity.  Assuming, without deciding, Lamont's liability from the Vaquillas Lawsuit pertains to Ricochet, public policy precludes any indemnity in this case because Lamont's liability arises from his own intentional torts.

## B.    History of the Fair Notice Requirements in Texas

Because Lamont is seeking to be excused and protected from his own intentional acts, we look to the history of the Express Negligence Test and whether the parties intended to protect

Lamont from his own actions.[1]  We note these were contractual indemnity provisions.  To be enforceable, an indemnity contract must satisfy the fair notice requirements: (1) the express negligence doctrine and (2) the conspicuousness requirement.  *Enserch Corp. v. Parker*, 794 S.W.2d 2, 8 (Tex. 1990).  Because this case does not raise the question of conspicuousness, or whether the language would "attract the attention of a reasonable person when he looks at it," we need only address the express negligence doctrine.  *See Dresser*, 853 S.W.2d at 508.

    *1.*        Ethyl Corp. v. Daniel Construction Co.

Texas courts place great restrictions on a party's ability to exculpate itself, in advance, of responsibility for its own negligence.  *See Ethyl Corp. v. Daniel Constr. Co.*, 725 S.W.2d 705, 708 (Tex. 1987).  In *Ethyl*, an employee of Daniel Construction was working on the premises of Ethyl Corporation constructing tie-in lines to connect an existing facility with a new facility.  *Id*. at 706.  The tie-in lines were to carry "aluminum alkyls, a highly volatile and inflammable substance."  *Id*.  The employee was seriously burned when alkyls escaped from the lines at the existing facility and ignited.  *Id*. at 707.  The evidence established that Ethyl was contractually obligated to "purge the existing lines of alkyls prior to the tie-in," while Daniel Construction was obligated to remove the valve handles from the existing lines to prevent them from being accidentally opened.  *Id.*  The alkyls escaped because neither party complied with its respective contractual obligation.  *Id*.  The jury found Ethyl and Daniel Construction negligent, and "apportioned the negligence 90% to Ethyl

---

[1] We note that Appellants specifically stated they waived the Express Negligence Test because their claim does not lie in negligence.  That being said, Appellants' pleadings and briefing *do* contend Lamont should not be indemnified for his own intentional torts.  Specifically, Appellants entitle their argument "Public Policy Should Prohibit Lamont's Claim For Indemnity For His Intentional Torts" and contend "that persons engaged in clearly improper conduct are not protected by corporate funds from the consequences of their wrongdoing."  The jury found no negligence as to Lamont, but did find Lamont liable for intentional torts.  Therefore, Appellants did not waive the application of the Express Negligence Test as to intentional torts.  *See State Bar of Tex. v. Heard*, 603 S.W.2d 829, 833 (Tex.1980) ("We look to the substance of a plea for relief to determine the nature of the pleading, not merely at the form of title given to it."); *accord* TEX. R. CIV. P. 71; *In re Estate of Blankenship*, 04-08-00043-CV, 2009 WL 1232325, at *3 (Tex. App.—San Antonio May 6, 2009, pet. denied) (mem. op.).

and 10% to Daniel" Construction. *Id.* Ethyl then sued Daniel Construction for indemnity based on the following clause in the parties' contract:

> Contractor [Daniel] shall indemnify and hold Owner [Ethyl] harmless against any loss or damage to persons or property as a result of operations growing out of the performance of this contract and caused by the negligence or carelessness of Contractor, Contractor's employees, Subcontractors, and agents or licensees.

*Id.*

The *Ethyl* court rejected Ethyl's argument that the inclusion of language indemnifying against "any loss" and "as a result of operations growing out of the performance of this contract" expressed the parties' intent for Daniel Construction to indemnity Ethyl for the consequences of Ethyl's own negligence. *Id.* at 708. The court examined the trend toward a more strict construction of indemnity contracts and adopted the express negligence doctrine. *Id.* at 707–08; *cf. Atl. Richfield Co. v. Petrol. Pers., Inc.*, 768 S.W.2d 724, 726 (Tex. 1989) (holding that language indemnifying for "any negligent act" sufficiently defined the parties' intentions and met the requirements of the express negligence rule); *B-F-W Constr. Co. v. Garza*, 748 S.W.2d 611, 613 (Tex. App.—Fort Worth 1988, no writ) (concluding that "'and regardless of any cause or of any fault or negligence of contractor' meets the express negligence test").

Under the express negligence doctrine, "parties seeking to indemnify the indemnitee from the consequences of its own negligence *must express that intent in specific terms*. Under the doctrine of express negligence, the *intent of the parties must be specifically stated within the four corners of the contract*." *Ethyl Corp.* 725 S.W.2d at 708 (emphasis added); *see Van Voris*, 402 S.W.3d at 919 (requiring explicit clarity for any party expressing an intent to protect a party for that party's negligence); *see also Enserch Corp.*, 794 S.W.2d at 8 (reinforcing requirement that words expressly state an indemnitee will be reimbursed even for its own negligence). Simply stated, absent language stating a clear intent to indemnify, there is no obligation to do so. *Ethyl*,

725 S.W.2d at 708. The court noted that the express negligence doctrine would preclude "scriveners of indemnity agreements [from devising] novel ways of writing provisions which fail to expressly state the true intent of those provisions." *Id.* at 707. Finally, the court held that because the indemnity provision did not expressly provide for indemnification of Ethyl's negligence or comparative indemnity in question, Ethyl was not entitled to recover anything under the contractual indemnity provision. *Id.* at 707–08.

2.       Dresser Industries, Inc. v. Page Petroleum, Inc.

In *Dresser Industries, Inc. v. Page Petroleum, Inc.*, the Texas Supreme Court further explained the policy reasons behind its adoption of the express negligence doctrine. 853 S.W.2d 505, 507–09 (Tex. 1993). Although the court recognized that indemnity agreements operate to transfer risk against existing or future loss liability, the court reasoned that using indemnity agreements to "exculpate a party from the consequences of its own negligence" goes further and involves "an extraordinary shifting of risk." *See id*. at 508. Under those circumstances, the express negligence doctrine mandates that the party use express language within the four corners of the contract specifically stating that the party will be indemnified for liability arising from the party's own negligence. *Id*. References to liabilities or claims in general will not suffice; instead, the language must specifically refer to liability pertaining to the party's own negligence. *See id*.; *cf. Atl. Richfield Co.*, 768 S.W.2d at 726 (identifying language in the indemnity provision which met requirements of the express negligence rule).

**C.       Application to Intentional Torts**

The same public policy concerns associated with extraordinary risk-shifting set forth in *Ethyl* and *Dresser* should apply with equal or greater force to intentional torts. *See Green Int'l Inc. v. Solis*, 951 S.W.2d 384, 387 (Tex. 1997) (distinguishing provisions that shift economic damages resulting from breach of contract with extraordinary shift from consequence of a person's

own future acts); c*f. Dresser*, 853 S.W.2d at 508; *Ethyl*, 725 S.W.2d at 708. As such, only an indemnity provision specifically stating an intent to indemnify the indemnitee for the indemnitee's intentional torts should be enforceable against the indemnitor for the indemnitee's intentional acts. *See Ethyl*, 725 S.W.2d at 708; *Dresser*, 853 S.W.2d at 508; *see also Ott v. Sonic Land Corp.*, No. 09-94-209CV, 1996 WL 185347, at \*7 ("If a release must expressly state it will release future negligence, then surely it must expressly state it will release future intentional tortious conduct.") We cannot conclude that a strict construction of the indemnity provisions in question expressly states the Appellants' intentions to indemnify Lamont for his own intentional torts. *Cf. Atl. Richfield Co.*, 768 S.W.2d at 726.

Moreover, we question whether public policy would prevent Lamont from "prospectively contractually exculpat[ing himself] with respect to intentional torts" even if the indemnity provisions contained the specific language.[2] *Solis v. Evins*, 951 S.W.2d 44, 50 (Tex. App.—Corpus Christi 1997, no writ); *accord Oxy USA, Inc. Sw. Energy Prod. Co.*, 161 S.W.3d 277, 283 (Tex. App.—Corpus Christi 2005, pet. denied); *Budner v. Wellness Int'l Network, Ltd.*, No. 3:06-CV-0329-K, 2007 WL 806642, at \*8 (N.D. Tex. 2007). Accordingly, because the indemnity provisions in question do not specifically state an intent to indemnify Lamont for liability arising from his own intentional torts, Appellants Jerry L. Hamblin and Ricochet Energy, Inc. have no obligation to indemnify Lamont for any liability arising out of the Vaquillas Lawsuit.

Patricia O. Alvarez, Justice

---

[2] We note the Texas Supreme Court has not specifically addressed "whether indemnity for one's own gross negligence or intentional injury may be contracted for or awarded by Texas courts." *Atl. Richfield Co. v. Petrol. Pers., Inc.*, 768 S.W.2d 724, 726 n.2 (Tex. 1989).