

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

No. 02-23-00151-CV

———————————————

LIFE INVESTORS MANAGEMENT COMPANY, LLC, Appellant and Appellee

V.

SETTLEMENTS OF TEXAS, INC.; JOHN TED BONHAM; RICHARD D. DEAN; ILS ENTERPRISES, LLC; DAVID BLACKBURN; LAWLER MANAGEMENT LLC; AND LAWLER MANAGEMENT II LLC, Appellees and Appellants

AND

SETTLEMENTS OF TEXAS, INC.; JOHN TED BONHAM; AND
RICHARD D. DEAN, Appellants

V.

LIFE INVESTORS MANAGEMENT COMPANY, LLC, Appellee

---

On Appeal from the 342nd District Court
Tarrant County, Texas
Trial Court No. 342-307672-19

---

Before Birdwell and Womack, JJ.; and Gonzalez, J.[1]
Memorandum Opinion by Justice Birdwell

---

[1]The Honorable Ruben Gonzalez, Judge of the 432nd District Court of Tarrant County, sitting by assignment of the Chief Justice of the Texas Supreme Court pursuant to Section 74.003(h) of the Government Code. *See* Tex. Gov't Code Ann. § 74.003(h).

# MEMORANDUM OPINION

## I. Introduction

This is a dispute over $2 million in life insurance proceeds and indemnification, and the parties to this appeal are individuals and entities affiliated with or controlled by those individuals. The trial court granted several summary judgments, awarded damages on some claims and take-nothing rulings on others, and awarded attorney's fees, costs, and interest.

In six issues, Appellant Life Investors Management Company, LLC (LIMC) complains that the trial court erred by granting summary judgment

- to Appellee ILS Enterprises, LLC (ILS) and ILS's principal Appellee David Blackburn (collectively, the ILS Parties);

- to Appellees Lawler Management LLC and Lawler Management II LLC (the Lawler Parties); and

- to Appellee Settlements of Texas, Inc. (SOT), SOT's principal Appellee Richard D. Dean, and Appellee John Ted Bonham (collectively, the SOT Parties), along with an award of prejudgment interest.

In two issues, the SOT Parties, as cross-appellants, complain that the trial court erred by eliminating the personal liability of Terry Hollan, LIMC's principal, to them for damages and attorney's fees.

We will affirm in part and reverse and render in part.

## II. Background

The outcome turns on two agreements—the WL McIntyre LLC Operating Agreement and the Administration Agreement, which was explicitly made subject to the Operating Agreement—and on summary-judgment procedure. *See* Tex. R. Civ. P. 166a(c). We will review these two agreements first, italicizing portions pertinent to the parties' disputes, and then recount the trial court proceedings leading to this appeal and cross-appeal.

### A. The Operating Agreement

The Operating Agreement was executed in 2014 to acquire and manage William L. McIntyre's eventual life-insurance settlement.[2] The following executed the Operating Agreement:

- McIntyre, the insured, whose beneficiaries would receive $1 million of the $11 million death benefit;

- WL McIntyre LLC;

- ILS as WL McIntyre LLC's Manager Member; and

- Eight Investor Members:

  o Three entities—MAC D1, LLC; MAC D2, LLC; and MAC D3, LLC—for which Dean signed on SOT's behalf as Manager; and

---

[2]We have previously explained the life-settlement business. *See Conestoga Tr. Servs., LLC, Tr. of Conestoga Tr. v. Focus Med. Underwriters, LLC*, No. 02-23-00003-CV, 2023 WL 4242808, at \*1 (Tex. App.—Fort Worth June 29, 2023, no pet.) (mem. op.).

o Five entities—MAC Interests 1, LLC; MAC Interests 2, LLC; MAC Interests 3, LLC; MAC Interests 4, LLC; and MAC S1, LLC—for which Blackburn signed on ILS's behalf as Manager.[3]

Under the Operating Agreement, only the Manager Member—ILS—could vote unless otherwise provided by the agreement and—unless otherwise expressly provided—each matter would be determined by ILS's vote, including any successor Manager's appointment. No new members could be admitted after WL McIntyre LLC's formation except upon ILS's consent. ILS's term as Manager was indefinite but would "terminate upon the earliest of the date of the Manager's inability to serve or dismissal for cause as Manager." Further, ILS could resign as Manager upon giving 10 days' written notice to each Member or could be dismissed "at any time only with cause, by consent and determination of the Manager Member, and upon a statement, in writing, signed by the Manager Member, specifying the stated cause for dismissal." Successor Managers were to be "appointed by the affirmative vote of the Manager Member."[4]

The Operating Agreement identified its Minority Member (McIntyre, the insured) and its "General Members," who were the Investor Members (owners of the Investor-Member units) and ILS, the Manager-Member (owner of the Manager-

---

[3]We will collectively refer to these entities as the Investor Members, and to enhance readability, we will refer to them and to individual LLCs other than WL McIntyre LLC without the LLC designation after the initial introduction.

[4]The Operating Agreement also stated that "[u]pon the failure of [ILS] to serve, for any reason, the Manager of the LLC will be appointed by Kyle Blackburn, of Oklahoma City, Oklahoma." No one has alleged that ILS failed to serve.

member unit). The Investor Members received their membership units in exchange for their capital contributions "in a private placement issue of Units by the LLC as an issuer, or as otherwise provided" in the Operating Agreement and "in further consideration of their commitment to make additional annual capital contributions to the LLC." ILS received its Manager-Member unit "in consideration of contributions of services and efforts in connection with the origination, formation and management of the LLC."

The "General Members" section of the Operating Agreement also contained another classification—"Originators." Regarding the Originators' interest (hereinafter, Originator Bonus), and as particularly pertinent to the dispute in the trial court about identifying Originators, the Operating Agreement contained a paragraph identifying some Originators and stating their services and compensation:

> In addition to the Investor Members and the Manager Member, there are Originators for the LLC (the names of which are [ILS], [SOT], Compass Life, LLC, *and others*) engaged by the LLC to provide services to the LLC to assist with the capitalization of the LLC and the implementation of the LLC's investment strategy, and the Originators will be compensated for their services in the form of an Interest entitling them to a payment of a share of the death benefit paid to the LLC from the Policy, in the total amount of $2,000,000, and which the Originators will apportion between them according to their separate agreement(s). ([ILS], [SOT], and Compass Life, LLC, have agreed that the interest of Compass Life, LLC, will be in the amount of $50,000, and that [ILS] and [SOT] will divide the remainder of the Originators interest between them *and others* who have provided services to the LLC for the implementation of its strategy.) [Emphases added.]

The Operating Agreement did not define "others" or "services" or further explain what was intended by "assist[ing] with the capitalization of the LLC and the implementation of the LLC's investment strategy."[5] The Operating Agreement also contained a merger clause to replace all earlier agreements and incorporated all the exhibits identified within it, one of which showed the membership interests and capital contributions of the Investor Members, McIntyre's $1 million interest, and the Originators' $2 million interest but which did not further identify the Originators or any "others" entitled to a share of the Originator Bonus.

On November 6, 2015, ILS as Originator assigned a $50,000 portion of its share of the Originator Bonus to Bonham. On December 29, 2015, ILS assigned an additional $800,000 portion to Bonham. Blackburn signed on behalf of ILS as Originator and on behalf of ILS as WL McIntyre LLC's Manager to acknowledge, consent, and accept the assignment.

The Operating Agreement had a "Mandatory Liquidation" clause that provided that upon (1) the occurrence of a "Mandatory Repurchase Event"—defined as "the death of McIntyre"—and (2) the receipt of the life insurance proceeds, WL McIntyre LLC was required to distribute to the members or their designees or beneficiaries

---

[5]In contrast, the Operating Agreement specifically defined "Effective Date," "Insured Member," "Minority Member," "General Members," various "Safe Harbor" terms under the Internal Revenue Code, "Mandatory Repurchase Event," "Dissolution," "Winding-up," "Liquidation," "including," "includes," and "person."

their respective portions of the net death benefit after payment of all LLC liabilities and then "[d]istribute the Balance of the LLC assets, if any, to the Manager Member."

The Operating Agreement separately defined "Dissolution," "Winding-up," and "Liquidation" in a different section. Under Section 15.1, "Definition of LLC dissolution, etc.," "dissolution" meant "the *cessation of its normal business activities* and *the beginning* of the process of winding up its business and internal affairs and of liquidating it." [Emphases added.] "Winding-up" meant "the process of *concluding* its existing business activities and preparing for its liquidation," and "liquidation" meant "the sale or other disposition of its assets and the distribution of its assets (or the distribution of the proceeds of the sale or other disposition of its assets) to its creditors and to the members." [Emphasis added.]

The next subsection, "Events causing dissolution," stated, "The LLC shall be dissolved: a. Upon the determination of the Manager Member, *but only after the occurrence of a Mandatory Repurchase Event*; b. Upon the issuance of an order of dissolution by a court or by the Secretary of State." [Emphasis added.] The section entitled "Winding-up of LLC," provided, "After the LLC is dissolved, the person or persons responsible for winding it up shall as expeditiously as reasonably possible: a. Wind up its business and internal affairs; and b. Cause its liquidation."

The Operating Agreement reserved the LLC's management to its Manager but allowed for the Manager to appoint an Administrator, stating,

7

1.7 <u>Reservation of LLC management to the Manager; appointment of an Administrator</u>. Except as otherwise expressly provided in this Agreement, the management of the business and internal affairs of the LLC shall be reserved to the Manager. The Manager will be responsible for day to day management and administration of the LLC business. The Manager may appoint one or more Administrators for assistance, with such powers to act on behalf of the LLC pursuant to this Operating Agreement, as the Manager may prescribe, in writing.

The Manager had the "general responsibility for overseeing the business and internal affairs of the LLC" and "any additional functions [that] are set forth in this Agreement," which could also be delegated "to an Administrator, in the discretion of the Manager," who would remain responsible for overseeing the Administrator.

## B. The Administration Agreement

ILS was Manager of WL McIntyre LLC and 179 other life-insurance-policy LLCs (the Policy LLCs), which included the Lawler Parties. Hollan formed LIMC in April 2015, and on June 1, 2015, ILS as Manager—for whom Blackburn signed—and LIMC, identified as "Administrator"—for whom Hollan, as LIMC's managing member, signed—executed the Administration Agreement.

The Administration Agreement appointed LIMC as Administrator to manage and carry out the Policy LLCs' day-to-day business operations but limited this authority under each LLC's operating agreement:

*Subject to each Operating Agreement of each Policy LLC*, the Administrator will have the sole and exclusive control of the management, business and affairs of the Policy LLCs and will make all decisions and take all actions for the Policy LLCs not otherwise provided for in this Agreement, including, without limitation to the following:

(a) entering into, making, and performing contracts, agreements, and other undertakings binding the Policy LLC's [sic] that may be *necessary, appropriate, or advisable in furtherance of the purposes of the Policy LLC*'s [sic] and making all decisions and waivers thereunder;

(b) opening and maintaining bank and investment accounts and arrangements, drawing checks and other orders for the payment of money, and designating individuals with authority to sign or give instructions with respect to those accounts and arrangements;

. . . .

(h) selecting, removing, and changing the authority and responsibility of lawyers, accountants, and other advisers and consultants;

. . . .

(j) determining distributions of company cash and other property *as provided in each Company Agreement.* [Emphases added.]

Under the Administration Agreement, the Administrator was responsible for collecting all administrative, origination, and other fees from each Policy LLC and for paying operational expenses from operating income. The Administrator was allowed to retain any net operating income remaining after payment of operating expenses "as its fee for the performance of its obligations under this Agreement."

The Administration Agreement also contained a three-sentence indemnity clause. The clause, located on the third page of the five-page contract (not counting exhibits) was not set off from the rest of the agreement or otherwise distinguishable

9

from any of its other paragraphs.[6] The Administration Agreement also contained a merger clause that specifically addressed the indemnification clause, stating, "This Agreement contains the entire agreement of the parties pertaining to and it supersedes all prior and contemporaneous agreements among the parties relating to the indemnification. No amendment to this Agreement is binding unless reduced to writing and signed by all parties."

The Administration Agreement stated that it could be terminated on the first to occur of: "(a) the *dissolution* or termination of the Policy LLC *under the terms of its Company Agreement* or under applicable law; (b) the written agreement of the parties hereto." [Emphases added.]

## C. Trial court proceedings

McIntyre died on July 5, 2018. Not quite a year later, on April 30, 2019, SOT sued LIMC and Hollan, seeking a declaratory judgment that absent any "others" under the Operating Agreement's Originator paragraph, it was entitled to $975,000 of the Originator Bonus plus interest and attorney's fees. *See* Tex. Civ. Prac. & Rem. Code Ann. §§ 37.002–.004, .009. SOT also complained that LIMC and Hollan had failed to make any distributions to SOT but rather had distributed some of the $2 million Originator Bonus to two entities that were not named in the Operating Agreement "in reliance on ancillary agreements and documents among the investors."

---

[6]The Administration Agreement's only paragraph in all capital letters set out the governing law and forum selection.

Bonham, ILS's Originator-Bonus successor, joined SOT in its first amended petition, and they argued that they were each entitled to $975,000 plus interest—or a minimum of $850,785 each plus interest if ancillary agreements outside the Operating Agreement were considered—and sought declarations supporting those awards, as well as damages for conversion and money had and received.[7]

LIMC countersued the SOT and ILS Parties. In its counterpetition, LIMC characterized ILS's management of WL McIntyre LLC and the other Policy LLCs as "disastrous," leading to LIMC's appointment as Administrator. LIMC incorporated by reference the Operating and Administration Agreements, among other documents, and attached them to its counterpetition. *See* Tex. R. Civ. P. 59 (stating that records and all other written instruments constituting in whole or in part the claim sued on may be made a part of the pleadings by copies thereof being attached or filed and referred to as such). LIMC also alleged that because of ILS's management deficiencies, between May 2, 2014, and April 9, 2015, ILS and Blackburn borrowed nearly $1.7 million from GTH Holdings LLC, a LIMC affiliate.

LIMC further alleged that the SOT and ILS Parties had tried to wrongfully divert almost $1.7 million of the Originator Bonus to themselves through an ancillary agreement, the "Diversion Agreement," which it attached to its counterpetition and which purported to show that Dean and Blackburn were each entitled to $850,785.

---

[7]To streamline our recitation, we do not mention claims that were later dropped.

11

LIMC claimed that SOT and Bonham had sued LIMC to force LIMC to comply with that agreement. LIMC contended that in the Diversion Agreement, the SOT Parties had acknowledged as Originators

    a.    Terry Hollan ([LIMC])
    b.    John L. Hinds III (Business and Estate Solutions, LLC [(BES)])
    c.    John Barnard (Wishbone Settlements, LLC)
    d.    Counter-Defendant Richard Dean
    e.    Counter-Defendant David Blackburn

and had omitted nine other WL McIntyre LLC Originators: Bob Reynolds, Brayden Black, Brent Worley, Dan Hutcheson, Jim Stanley, John McNamara, Kelly Clenney, Kent Freeman, and Mike Hentges.

LIMC sought indemnification from ILS and SOT under the Administration Agreement and sought declarations that the Administration Agreement had not been terminated and that LIMC remained WL McIntyre LLC's Administrator. In its original counterpetition, LIMC set out and relied solely on the indemnity clause's second sentence:

> Manager and each Policy LLC (jointly and severally) will further indemnify, defend and hold Administrator harmless against reasonable and necessary expenses, costs, obligations and fees (including court costs and attorneys' fees) that Administrator may incur in defending or evaluating claims, demands, actions, judgments, penalties or enforcement actions brought by any person, entity, governmental regulatory authority (whether state or federal) and in enforcing this Agreement.

The day after LIMC countersued, SOT and Bonham amended their petition, alleging that ILS had appointed SOT as replacement Manager and had terminated

12

LIMC as Administrator on November 21, 2019; that on January 9, 2020, SOT had appointed Dean as the exclusive authorized user and signatory for WL McIntyre LLC's bank account at Amarillo National Bank (ANB); and that LIMC and Hollan no longer had authority over WL McIntyre LLC. They sought additional declarations regarding authority over the bank account because ANB had frozen the funds. Several months later, SOT and Bonham amended their petition to seek additional declarations.[8]

### 1. The SOT Parties' first motion for partial summary judgment

The SOT Parties moved for partial summary judgment on their declaratory judgment claims regarding LIMC's authority over WL McIntyre LLC and on some of LIMC's counterclaims. To the motion, they attached the Operating and Administration Agreements and Dean's affidavit, in which he averred that WL McIntyre LLC had appointed him as its bank account's "exclusive authorized user and signatory" but that ANB had frozen the account and denied access "until the Court determines who has control over the Bank Account."[9]

---

[8]Given the volume of paperwork filed by all parties, we will only list the declarations made pertinent in the trial court's summary judgments and final judgment when our recitation reaches that part of the proceedings. *See* Tex. R. App. P. 47.1.

[9]The SOT Parties relied on the "Appointment of Manager WL McIntyre, LLC," signed November 21, 2019, which purported to "revoke[], cancel[], and vacate[]" any appointment of LIMC or its agents as to WL McIntyre LLC. This document was created months after SOT filed suit. *Cf.* Tex. R. Civ. P. 166a(c) (describing proper summary-judgment evidence). We questioned their reliance on this

13

The SOT Parties also attached some of LIMC and Hollan's discovery responses. In those responses, LIMC and Hollan admitted, subject to some unruled-upon objections, that:

- On July 5, 2018, there was a Mandatory Repurchase Event pursuant to the Operating Agreement;

- No written document appointed LIMC as "Manager";

- ILS appointed LIMC as an "administrator" under the Administration Agreement; and

- There was no written amendment to the Operating Agreement that identified any Originators or "others" besides ILS, SOT, and Compass Life.

LIMC and Hollan stated in response to an interrogatory that as to the $2 million set aside as the Originator Bonus, the bank account's current balance was $1,793,776.01, and that they had made distributions from that account to Josh Zabrocki for $50,000; Hinds (BES) for $99,840; and Barnard (Wishbone Settlements) for $48,750, as well as a refund of $7,650 "to investors in MAC D2 and MAC D3 who had paid 2019 and 2020 capital calls in advance."

To their summary-judgment response, LIMC and Hollan attached Hollan's ten-page unsworn declaration to support their argument that the Operating and Administration Agreements—copies of which they incorporated by reference from the SOT Parties' summary-judgment evidence—"clearly and unambiguously vest

---

after-the-fact document during oral argument, but in light of our disposition, we need not revisit our concerns.

14

[LIMC] with management of, and control over, [WL] McIntyre LLC" and that the Administration Agreement "clearly and unambiguously" precluded any termination unless as a result of WL McIntyre LLC's termination or LIMC's written agreement to termination. They also incorporated by reference from the SOT Parties' summary-judgment evidence a November 21, 2019 "Purported Termination Letter." The letter by ILS on behalf of WL McIntyre LLC purported to terminate LIMC's services based on the need "to ensure an orderly liquidation," to affirm the appointment of SOT as WL McIntyre LLC's new Manager and Administrator, to demand the return of WL McIntyre LLC's assets and the wiring of its bank account's funds at ANB to ILS's account, and to clarify that the termination did not apply to the other Policy LLCs.

As pertinent to the trial court's declarations in its first partial summary judgment, Hollan stated his understanding (or misunderstanding) of the facts and the law in his unsworn declaration:

> 21. [LIMC] fully performed its duties and obligations with respect to the Member and Estate Disbursements. Part of those duties and obligations included the proper disbursement of the Originator [Bonus] pursuant to the terms of the Operating Agreement and the Administration Agreement.

> 22. Contrary to the terms of the Operating Agreement and the Administration Agreement, SOT, Bonham and Dean immediately sought to compel [LIMC] to disburse substantially all of the Originator [Bonus] to themselves, and to deprive *other Originators and persons entitled to share in the Originator* [*Bonus*] from receiving any portion of the money. [Emphasis added.]

> . . . .

15

26. In what is a clear effort to try to improperly disburse the Originator [Bonus] to SOT, Bonham and Dean, on November 21, 2019, ILS delivered a letter to [LIMC] purporting to terminate the Administration Agreement as to [the WL] McIntyre LLC only, and notifying [LIMC] that SOT had purportedly been appointed as the manager in ILS's stead (the "Purported Termination Letter"). A true and correct copy of which is attached to the [SOT Parties'] Motion for Summary Judgment as Exhibit F.

27. [LIMC] has not agreed to terminate the Administration Agreement with [WL] McIntyre LLC and will not do so. Moreover, [WL] McIntyre LLC has not been *completely* dissolved and terminated. [Emphasis added.]

. . . .

29. Under the Administration Agreement, ILS has no authority to terminate [LIMC] as Administrator.

30. While the Operating Agreement delegates all managerial rights and functions to the manager, it also provides that that authority may be delegated to an administrator. One of the managerial rights delegated to the manager under the Operating Agreement is the exclusive right to appoint an administrator. If the right of appointment of an administrator has been delegated to an administrator, then the appointed administrator has the exclusive right to appoint any and all administrators.

31. The Administration Agreement delegates all rights, duties and functions of the manager to [LIMC], as Administrator, Therefore, it is [LIMC], and only [LIMC], that has the authority to appoint an administrator of [WL] McIntyre LLC. Unless the appointment is terminated by mutual agreement *or by the winding up of the entity*, the administrator continues, and continues to retain all of the rights, duties and authority of the manager, even if a new manager is appointed. [Emphasis added.]

32. [LIMC] has refused to succumb to the coercive attempt to terminate the Administration Agreement and has refused to apportion the Originator [Bonus] in the manner demanded under the collusive

16

Diversion Agreement.[10] [LIMC] has done so to protect: a) the rights of all the Originators that are entitled to a fair share of the Originator [Bonus], that have not agreed to the Diversion Agreement and that have been excluded from the Diversion Agreement; and b) prevent the diverting additional monies from [WL] McIntyre LLC that they are not entitled to.

. . . .

36. ILS has no authority to terminate [LIMC] as Administrator under the Operating Agreement and the Administration Agreement.

Three days after LIMC and Hollan filed their summary-judgment response, the SOT Parties sought to strike it as untimely and objected to most of Hollan's unsworn declaration[11] as speculative, conclusory, made without personal knowledge, and containing inadmissible hearsay and inadmissible, self-serving legal opinions. *See* Tex. R. Civ. P. 166a(f) (stating that "affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein").

## 2. The first partial summary-judgment order

The trial court's order reflects that it considered the SOT Parties' motion "and any and all responses and/or replies as well as oral argument of counsel." The record does not contain an express ruling on the SOT Parties' evidentiary objections. The trial court granted the motion in part as summarized below:

---

[10]This is the sole paragraph in Hollan's first unsworn declaration referencing the alleged "Diversion Agreement," which neither party attached as summary-judgment evidence in the first motion and response.

[11]Among others, the SOT Parties objected to Paragraphs 21–22, 26, and 36.

- SOT has the present and continuing right to administer, control, direct, and, in all things, manage WL McIntyre LLC's business and property, and LIMC and Hollan do not;

- WL McIntyre LLC's appointment of Dean as an authorized signatory with full access and control over the WL McIntyre LLC account at ANB is valid and enforceable; and

- Neither LIMC nor Hollan is an authorized signatory under any agreement or approval binding on WL McIntyre LLC.

### 3. The ILS Parties' countersuit against LIMC and Hollan

After the SOT Parties' first partial summary judgment, the ILS Parties countersued LIMC and Hollan, alleging that LIMC and Hollan had breached the Administration Agreement.[12] They also alleged that in 2015, LIMC had hired Hentges—identified by LIMC in its counterclaim as an Originator—to work on administering the Policy LLCs but that LIMC had failed to adequately supervise him and that on November 21, 2019, ILS had appointed SOT as replacement Manager on behalf of WL McIntyre LLC's members and had notified LIMC and Hollan that their WL McIntyre LLC Administrator role was terminated.

---

[12]The ILS Parties also argued that the Administration Agreement was invalid and unenforceable due to economic duress, claiming that Hollan, through GTH Holdings, had entered into seven promissory notes with ILS and Blackburn totaling approximately $2.8 million—not the almost $1.7 million alleged in LIMC's original counterclaim—with each note bearing a usurious interest rate, and then had used the notes' foreclosure to coerce Blackburn to sign the Administration Agreement.

### 4. The SOT Parties' second motion for partial summary judgment and LIMC and Hollan's amended counterclaim

SOT and Bonham moved for partial summary judgment on LIMC's indemnification counterclaim, asserting in one of their grounds that LIMC was not entitled to indemnification because the Administration Agreement's indemnification clause was not "conspicuous," and arguing that LIMC's remaining counterclaims had either been resolved or mooted. To their motion they attached, among other things, the trial court's October 16, 2020 partial-summary-judgment order, LIMC's original counterclaim (but not the counterclaim's exhibits), and LIMC and Hollan's response to the first summary-judgment motion (but not the exhibits attached to the response).

Seven days before the summary-judgment hearing, *see* Tex. R. Civ. P. 166a(c), LIMC filed its second amended counterclaim against the SOT and ILS Parties[13] and filed objections and a summary-judgment response.

In its second amended counterclaim, LIMC added WL McIntyre LLC as a counterdefendant and added Hollan and GTH Holdings as counterplaintiffs. LIMC recounted the Diversion Agreement's "Acknowledged Originators" as Hollan (LIMC), Hinds (BES), Barnard (Wishbone Settlements), Dean, and Blackburn; added Jim Hinds,[14] "Dean/SOT," and "Hollan/LIMC" to its earlier list of alleged

---

[13]The record does not contain LIMC's first amended counterclaim.

[14]The parties have not directed us to any information about Jim Hinds—as opposed to John Hinds (BES)—in the summary-judgment evidence or elsewhere in

Originators of capital for WL McIntyre LLC—Reynolds, Black, Worley, Hutcheson, Stanley, McNamara, Clenney, Freeman, and Hentges—and added GTH Holdings as an alleged "Strategy Originator." LIMC contended that SOT, Dean, and Bonham had "seized and taken control of the entirety of the Originator Bonus amount for themselves."[15] LIMC continued to seek, among other things, indemnification from ILS and SOT under the second sentence of the Administration Agreement's indemnification clause and declarations that the Administration Agreement's purported termination was ineffective and that LIMC remained WL McIntyre LLC's Administrator.

LIMC also added a money-had-and-received claim as to all the counterplaintiffs; GTH Holdings's breach-of-contract claim against the ILS Parties and WL McIntyre LLC; LIMC's breach-of-contract claim against WL McIntyre LLC; and LIMC, GTH Holdings, and Hollan's claim for "wrongful execution/abuse of process/tortious interference" against the SOT Parties for interfering in their relationship with ANB.

---

the almost 5,000-page clerk's record, and LIMC does not identify him as an "Omitted Originator" in its appellate brief.

[15]In contrast, in the SOT Parties' first summary-judgment motion, they accused Hollan of being "an opportunist who is in possession of property he admits is not his and will not give up until he is paid a ransom." To simplify, then, the parties essentially argued that each side was "trying to kidnap what [the other side had] rightfully stolen." *The Princess Bride* (20th Century Fox 1987).

In their summary-judgment response,[16] and during the January 29, 2021 summary-judgment hearing, LIMC and Hollan informed the trial court that after the October 16, 2020 partial summary-judgment order, ANB had released WL McIntyre LLC's nearly $1.7 million[17] to SOT and Bonham. SOT and Bonham's counsel admitted that he had released the funds to his clients. The trial court responded, "I didn't intend for you guys to take the money and release it to your client." The trial court denied the SOT Parties' motion.

## 5. The Lawler Parties' intervention

In March 2021, the Lawler Parties intervened, complaining that LIMC had unlawfully withheld and misappropriated funds owed to them and their investors (including Blackburn) under the Administration Agreement's indemnification clause. The Lawler Parties sued LIMC for breach of contract and conversion and sought a declaration that they owed no indemnification obligation to LIMC in connection with this litigation.

---

[16]LIMC and Hollan attached no evidence to this response but incorporated by reference some of the SOT Parties' exhibits.

[17]The amount was shy of $2 million because, as Hollan admitted in his deposition as LIMC's corporate representative, LIMC and Hollan had paid $35,000 to an Amarillo accountant to "close out all the subpartnerships" for the Investor LLCs and had paid $141,221.08 to themselves as "back administration fees that hadn't been collected yet." He did not testify that the accountant fees were "necessary, appropriate, or advisable," as permitted by the Administration Agreement, or that any of the fees were net operating income remaining after payment of operating expenses, which LIMC was allowed to retain "as its fee for the performance of its obligations" under the Administration Agreement.

21

### 6. Severance

The SOT Parties moved to strike or sever GTH Holdings and WL McIntyre LLC from the lawsuit, complaining that claims involving the new parties had expanded the litigation's scope outside the original claims and were "based on allegations that are directly in contravention" to the declarations in the trial court's October 16, 2020 partial-summary-judgment order. The trial court granted the severance.

### 7. Remaining summary-judgment motions and responses

#### a. The SOT Parties' third summary-judgment motion

On August 13, 2021, the SOT Parties moved for summary judgment on their remaining claims against Hollan and LIMC—declarations on their entitlement to and proper apportionment of the Originator Bonus plus joint and several liability against LIMC and Hollan for any outstanding amounts, the validity of the ILS–Bonham assignment, and LIMC and Hollan's liability for conversion and money had and received—and on LIMC and Hollan's claims against them for indemnification, money had and received, tortious interference, wrongful execution, and abuse of process.

In their motion, the SOT Parties explained the "critical distinction" between "originators of the Investor LLCs" and WL McIntyre LLC's Originators. To their motion, in addition to the Operating and Administration Agreements and the trial court's prior partial-summary-judgment order, the SOT Parties attached Dean's

affidavit explaining WL McIntyre LLC's and the Investor Members' financing and management structures.

In his affidavit, Dean explained that SOT and Compass Life had found and facilitated a contribution to capitalize WL McIntyre LLC, which was further capitalized by selling membership units to the Investor Members through separate subscription agreements, operating agreements, and private placement memoranda. Dean's affidavit sponsored copies of these supporting documents.

Regarding the capitalization structure, Dean explained,

Each Investor [Member] LLC had its own private placement memorandum that explained the specific investment strategy and potential risks, an operating agreement that governed its business affairs, and a subscription agreement whereby an individual investor can purchase membership units in an Investor [Member] LLC. . . . Each Investor [Member] LLC also used a series of "originators" to help facilitate the sale of its membership units to individual investors. The originators of the Investor [Member] LLCs are identified in the operating agreement for each particular Investor [Member] LLC. The individuals identified in the respective Investor [Member] LLC operating agreements helped introduce investors who were interested in purchasing the membership units of a particular Investor [Member] LLC.

. . . The structural layers of the investment strategy for [WL McIntyre LLC] . . . allowed there to be a set of "originators" under the [WL McIntyre LLC] Operating Agreement and different "originators" under the Investor [Member] LLC operating agreement. SOT, ILS and Compass are all identified as "Originators" of [WL McIntyre LLC] because of their work in setting up the investment strategy and structure of [WL McIntyre LLC], and they are the entities that capitalized [WL McIntyre LLC] by acquiring its membership units on behalf of the Investor [Member] LLCs.

In the WL McIntyre LLC subscription agreements, each Investor Member agreed to acquire and hold its membership units subject to the "terms and conditions of the Operating Agreement." The subscription agreements set out the following:

- For MAC D1, MAC D2, and MAC D3, the investor agreed to purchase an Investor Member interest in WL McIntyre LLC for an aggregate investment valued at $1,250,000 "as set forth in the Operating Agreement for the Company," with investment amounts contributed by MAC D1 and MAC D2 as a "capital contribution" in the amount of $80,773, and by MAC D3 in the amount of $90,823.

- For MAC Interests 1 and 2, the investor agreed to purchase an Investor Member interest in WL McIntyre LLC for an aggregate investment valued at $921,552.22 "as set forth in the Operating Agreement for the Company," with an investment amount contributed by MAC Interests 1 and 2 each as a "capital contribution" in the amount of $133,743.

- For MAC Interests 3 and 4, the investor agreed to purchase an Investor Member interest in WL McIntyre LLC for an aggregate investment valued at $453,447.78 "as set forth in the Operating Agreement for the Company," with an investment amount contributed by MAC Interests 3 and 4 each as a "capital contribution" in the amount of $65,808.

- For MAC S1, the investor agreed to purchase an Investor Member interest in WL McIntyre LLC for an aggregate investment valued at $1,500,000 "as set forth in the Operating Agreement for the Company," with an investment amount contributed by MAC S1 as a "capital contribution" in the amount of $217,693.

The SOT Parties also attached Blackburn's unsworn declaration in which he provided the same explanation as Dean regarding WL McIntyre LLC's capitalization structure and further explained the steps involved for an individual investor to participate in the WL McIntyre LLC-acquired life settlement:

> For an individual investor to participate in the life settlement, multiple steps needed to occur. First, [WL McIntyre LLC] acquired the Policy.

Second, [WL McIntyre LLC] sold its membership units to the Investor [Member] LLCs pursuant to separate subscription agreements. Third, the Investor [Member] LLCs needed to sell each of their allocable share of the membership units in [WL McIntyre LLC]. Based upon this structure, when Mr. McIntyre died, the Policy benefits would be distributed to [WL McIntyre LLC], which would then distribute the proceeds to the Investor [Member] LLCs, which each would then make distributions to the individual investors who invested in the Investor [Member] LLCs.

Blackburn also explained that the Investor Members' originators "received an upfront fee as reflected . . . to ensure that the financial advisors who helped introduce investors into the life settlement did so at the Investor [Member] LLC level." He identified SOT, ILS, and Compass Life as WL McIntyre LLC's Originators "because of their work in setting up the investment strategy and structure of the Company," and stated that they were the entities that had capitalized WL McIntyre LLC "by facilitating the sale of its membership units to the Investor [Member] LLCs that they controlled," entitling them to the shares of the $2 million Originator Bonus allocated to them in the Operating Agreement.

In his declaration, Blackburn stated that after McIntyre died in July 2018, WL McIntyre LLC received the policy benefits and distributed the required funds to McIntyre's heirs and the Investor Members under the Operating Agreement, and then the Investor Members distributed their portions of the funds to their investors "pursuant to each of their operating agreements."

Blackburn also stated that in early 2014, Josh Zabrocki, a Compass Life broker, had contacted Dean to gauge SOT's interest in McIntyre's life-insurance policy, and

ILS and SOT "teamed up . . . to put together a strategy to acquire the Policy and create the life settlement opportunity for investors." Blackburn stated that through counsel, on or around April 3, 2014, he created WL McIntyre LLC to hold the policy and arranged to pay Compass Life a brokerage fee by expressly including it as an "Originator" in the Operating Agreement.

The SOT Parties attached excerpts from Zabrocki's March 11, 2021 deposition. In his deposition, Zabrocki testified that he had dealt with Dean and Blackburn on the McIntyre policy, which he had identified for them in 2014 as an investment opportunity, and that he first became aware of Hollan after McIntyre died.

Each of the eight Investor Members' offering documents included instructions on how to subscribe and listed the entities' originators, as did their operating agreements, which copied the list of originators but added "and such other individuals and entities as may be identified" in any amended operating agreement.

- MAC D1: The offering documents and operating agreement identified ILS and SOT as originators, with SOT as holder of the manager-member interest and as initial member; RCB Investors LLC as investor member; and Dean as initial manager, and stated the required funding to participate as an investor member in MAC D1, which would then participate in WL McIntyre LLC.

- MAC D2: The offering documents and operating agreement identified SOT (acting through Dean and two others),[18] Dan Hutcheson, Brayden Black, and some Kansas residents, and Settlements of Illinois LLC as originators, with SOT as holder of the manager-member interest, Dean as initial manager, and Missouri

---

[18]In the interest of brevity, we will not name individuals unless they have been mentioned in a claim or counterclaim or are identified more than once. *See* Tex. R. App. P. 47.1.

residents as investor members, and stated the required funding to participate as an investor member in MAC D2, which would then participate in WL McIntyre LLC.

- MAC D3: MAC D3's offering documents and operating agreement contained the same information as MAC D2.

- MAC Interests 1: The offering documents and operating agreement identified ILS, BES (identified by LIMC in its second amended counterclaim as John Hinds III), three other Louisiana-based LLCs, and a Louisiana resident as originators, with ILS holding the manager-member interest, ILS as initial manager, and "up to twenty-three" others as investor members, and stated the required funding to participate as an investor member in MAC Interests 1, which would then participate in WL McIntyre LLC and three other life-settlement investment vehicles.

- MAC Interests 2: The offering documents and operating agreement identified ILS, Kelly Clenney, and GTH Holdings (Hollan) as originators, with ILS holding the manager-member interest, ILS as initial manager, and "up to twenty-three" others as investor members, and stated the required funding to participate as an investor member in MAC Interests 2, which would then participate in WL McIntyre LLC and three other life-settlement investment vehicles.

- MAC Interests 3: The offering documents and operating agreement identified ILS and Wishbone Settlements (identified by LIMC in its second amended counterclaim as John Barnard) as originators, with ILS holding the manager-member interest, ILS as initial manager, and "up to twenty-three" others as investor members, and stated the required funding to participate as an investor member in MAC Interests 3, which would then participate in WL McIntyre LLC and three other life-settlement investment vehicles.

- MAC Interests 4: The offering documents and operating agreement identified ILS, Jim Stanley, Bob Reynolds, Brent Worley, Kent Freeman, and Jay Bogdahn as originators, with ILS holding the manager-member interest, ILS as initial manager, and "up to twenty-three" others as investor members, and stated the required funding to participate as an investor member in MAC Interests 4, which would then participate in WL McIntyre LLC and three other life-settlement investment vehicles.

- MAC S1: The offering documents and operating agreement identified ILS, Stanley, Reynolds, Worley, Freeman, Mike Hentges, Bogdahn, Ron May, Noel Williams,

27

and Innovative Insurance Retirement Solutions LLC as originators, with ILS holding the manager-member interest, ILS as initial manager, and "up to twenty-three" others as investor members, and stated the required funding to participate as an investor member in MAC S1, which would then participate in WL McIntyre LLC.

The SOT Parties attached to their motion the Investor Members' "New Business Sheets," which showed that MAC D1's originator was SOT; that MAC D2's originators were Dean, Hutcheson, Black, and Settlements of Illinois; that MAC D3's originators were Dean, Hutcheson, MacNamara, and Life Settlements of Illinois; and that MAC Interests 1's originators were BES (Hinds) and JPC Consulting LLC. Unlike MAC D1, MAC D2, and MAC D3's "new business" forms, MAC Interests 1's form had a space for an originator and for a "Finder's Fee." BES and JPC Consulting split two finder's fees in July 2014, and BES received eight additional finder's fees between July 11, 2014, and October 7, 2014.

MAC Interests 2's "new business" forms did not list an originator, just finders, of which Hollan was one, listed on some of the forms as Hollan "DBA GTH Holdings." Clenney was listed with Hollan as a finder except on one of the forms, which had a note that Clenney "is not an originator on this one. The sale is going to someone else, so split it 1/3 Dave, 2/3 GTH Holdings and [Hollan] will forward the 1/3 on to the other person." Clenney and GTH Holdings (Hollan) otherwise split the finder's fees.

MAC Interests 4's "new business" form showed Freeman, Reynolds, and Stanley as originators who also received fees that were sometimes listed as finder's

fees and other times as originator's fees. MAC S1's new business form showed Stanley, Reynolds, Hentges, and Worley as originators who also received finder's or originator's fees.

The SOT Parties attached excerpts from Hollan's July 12, 2021 deposition in which he testified as LIMC's corporate representative and his July 13, 2021 deposition in which he testified individually. In response to a question in his corporate-representative deposition about his claim to being a WL McIntyre LLC Originator because he had helped to fund WL McIntyre LLC, Hollan replied, "I wore both hats. Now I wear three hats -- four hats, okay; number one, funder; number two, I raise capital; number three, I'm the administrator; and number four, I'm manager." He claimed that he had underwritten the investment through loans, which he acknowledged had since been repaid. He claimed that ILS had given LIMC the ability to divide the Originator Bonus in the Administration Agreement and "all the rights as a manager," although he agreed that, under the Operating Agreement, he was not the manager. He also agreed that the Operating Agreement had not been amended to identify any "others."

In his deposition as an individual, Hollan testified that he was GTH Holdings's manager and that by the time of his deposition on July 13, 2021, the debts between GTH Holdings, ILS, and "the various borrowers," had been repaid.

The SOT Parties also attached LIMC and Hollan's discovery admissions that they were not Operating Agreement signatories and, regarding conversion, their

29

interrogatory response that asked LIMC and Hollan to "[i]dentify and describe any and all administrative fees that You have received in exchange for services that You have provided to the Company, including the amount of any such fees, the date upon which You received such fees, and the reason for which You received such fees (list specific services provided)." LIMC and Hollan responded, "See chart attached hereto Bate No. LIMC00659."

We have summarized LIMC and Hollan's chart, which shows that administration fees for each Investor Member involved in WL McIntyre LLC were $6,000 per year.[19]

| LLC | 2015 Admin | 2016 Admin | 2017 Admin | 2018 Admin | 2019 Admin | TOTAL |
|---|---|---|---|---|---|---|
| MAC D1 | $6,000 | $6,000 | $6,000 | $6,000 | - | $24,000 |
| MAC D2 | $6,000 | $6,000 | $6,000 | $6,000 | - | $24,000 |
| MAC D3 | $6,000 | $6,000 | $6,000 | $6,000 | - | $24,000 |
| MAC S1 | $6,000 | $6,000 | $6,000 | $6,000 | - | $24,000 |
| MAC Ints. 1 | $6,000 | $6,000 | $6,000 | $6,000 | $6,000 | $30,000 |
| MAC Ints. 2 | $6,000 | $6,000 | $6,000 | $6,000 | $6,000 | $30,000 |
| MAC Ints. 3 | $6,000 | $6,000 | $6,000 | $6,000 | $6,000 | $30,000 |
| MAC Ints. 4 | $6,000 | $6,000 | $6,000 | $6,000 | $6,000 | $30,000 |
| | **2015 Admin** | **2016 Admin** | **2017 Admin** | **2018 Admin** | **2019 Admin** | **TOTAL** |
| | $48,000 | $48,000 | $48,000 | $48,000 | $24,000 | $216,000 |

The SOT Parties also attached excerpts from the March 29, 2021 deposition of ANB's general counsel regarding the bank's relationship with Hollan and LIMC and other evidence that—to avoid redundancy—we discuss below in our analysis.

---

[19]The subscription exhibits showed that MAC D1, MAC D2, MAC D3, and MAC S1 invested solely in WL McIntyre LLC, ending their annual administration fees with McIntyre's 2018 death. MAC Interests 1–4, on the other hand, participated in three additional Policy LLCs, so their administration fees continued beyond McIntyre's death.

The SOT Parties set their August 13, 2021 summary-judgment motion for a hearing on September 17, 2021, making LIMC and Hollan's response due by September 10, 2021. *See* Tex. R. Civ. P. 166a(c) ("Except on leave of court, the adverse party, not later than seven days prior to the day of hearing may file and serve opposing affidavits or other written response.").

### b. The ILS Parties' summary-judgment motion

The ILS Parties also filed their summary-judgment motion on August 13, 2021. In their motion, they sought summary judgment on LIMC's indemnification claim against ILS, on LIMC's money-had-and-received claim against ILS and Blackburn, and on their breach-of-contract claim against LIMC. Among other things, they argued that the indemnity provision LIMC relied upon was unenforceable under Texas's fair-notice requirement and that LIMC had no contractual right to unilaterally withhold funds from the Policy LLCs based on its purported indemnity rights or for any other reason. They also argued that LIMC had no money-had-and-received claim against them because they were not holding the funds at issue and had no rights to the funds, which had been assigned to Bonham in 2015.

To their motion, the ILS Parties attached the Administration Agreement, Blackburn's unsworn declaration, and correspondence between Blackburn and Hollan:

- An August 6, 2020 letter to Blackburn in which Hollan demanded indemnification by ILS under the Administration Agreement for the current litigation, in which he had incurred $223,184 in attorney's fees and $2,443.38 in expenses.[20]

- December 22, 2020 letters from LIMC to Blackburn in which Hollan stated that LIMC was retaining $20,375 from Lawler Management LLC and $81,500 from Lawler Management 2 LLC under the Administration Agreement.[21]

They also attached the Lawler Parties' operating agreements, LIMC's April 2015 certificate of formation, and excerpts from Hollan's deposition as LIMC's corporate representative. The ILS Parties set their summary-judgment motion for a hearing on September 23, 2021, making LIMC and Hollan's summary-judgment response due by September 16, 2021. *See id.*

### c. The Lawler Parties' summary-judgment motion

The Lawler Parties also moved for summary judgment on August 13, 2021. In their motion, they sought summary judgment on their conversion and declaratory-judgment claims against LIMC, arguing that LIMC had no right to withhold amounts due them "based on its purported right to indemnity from ILS in the Administration Agreement." They relied on the ILS Parties' unenforceability arguments and argued that if the trial court agreed that LIMC had no right to withhold their funds, then they were entitled to summary judgment on their conversion and declaratory-relief claims.

---

[20]The ILS Parties sued LIMC and Hollan on December 2, 2020.

[21]The Lawler Parties intervened on March 9, 2021.

The Lawler Parties incorporated by reference the background section of ILS's summary-judgment motion, attached the same exhibits, and joined in the ILS Parties' notice of oral hearing, setting their summary-judgment motion to be heard on September 23, 2021, and making LIMC and Hollan's summary-judgment response due by September 16, 2021. *See id.*

### d. LIMC and Hollan's late summary-judgment responses

LIMC and Hollan did not timely file their summary-judgment responses to any of the above motions. *Cf. id.*

LIMC and Hollan filed their response to the SOT Parties' motion on October 15, 2021, and attached Hollan's new unsworn declaration through which they attempted to sponsor five exhibits.[22] Per our discussion below, we do not consider this declaration or these exhibits. *See* Tex. R. App. P. 47.1.

Several hours after filing their late response, LIMC and Hollan filed a motion for leave to file the late response, observing that the SOT Parties' summary-judgment hearing had been reset for October 20, 2021, on a motion that the SOT Parties had filed on August 13, 2021, and had initially set for a hearing on September 23, 2021. In

---

[22]LIMC and Hollan also incorporated by reference the SOT Parties' "Exhibits D, E, F, H, I, L, M, N, O, P, S, and W through EE," as well as "[a]ll evidence submitted in Response to Plaintiffs'/Counter-Defendants' previously filed Motions for Summary Judgment." In response to the SOT Parties' first motion, they had attached declarations by Hollan and Ryan Lurich (attorney's fees) and incorporated by reference the Administration and Operating Agreements and Purported Termination Letter attached as exhibits to the SOT Parties' motion. They attached no evidence in response to the SOT Parties' second motion.

their motion, they recounted various calamities that had befallen them and their counsel in August, September, and October and argued that a one-day delay in filing would cause no prejudice. They did not verify their motion or support it with an affidavit or unsworn declaration. *Compare Carpenter v. Cimarron Hydrocarbons Corp.*, 98 S.W.3d 682, 685, 688 (Tex. 2002) (op. on reh'g) (explaining that the trial court did not abuse its discretion by denying leave to file a late summary-judgment response when the respondent's motion for leave was not "accompanied by any supporting affidavits or other evidence" and the motion to submit the late response was not filed until the day of the hearing), *with Verhalen v. Akhtar*, 699 S.W.3d 303, 304, 306 (Tex. 2024) (distinguishing *Carpenter* and concluding trial court abused its discretion by denying leave to file a summary-judgment response that was one day late when counsel showed that she promptly investigated and explained the sequence of events that caused the deadline to be missed and took initiative to correct it by tendering the summary-judgment response and motion for leave with an affidavit explaining the delay within twenty-four hours of the deadline and the movants had at least five days to consider the response, prepare for the summary-judgment hearing, and file replies and did not file a response in opposition to the motion for leave to file the late response).

The SOT Parties moved to strike the untimely summary-judgment response, pointing out that their summary-judgment motion had been on file for nine weeks and that LIMC and Hollan had waited until after 5 p.m. on a Friday to file their

34

motion for leave. They argued that LIMC and Hollan had not established good cause for the late filing with sworn proof that their failure to timely respond was not intentional or the result of conscious indifference but rather the result of accident or mistake, *see Verhalen*, 699 S.W.3d at 304, 307, and that the trial court was entitled to ignore the unsworn statements in their motion in determining whether to grant leave. They also raised a multitude of objections to LIMC and Hollan's summary-judgment evidence. In their reply in support of their summary-judgment motion, the SOT Parties incorporated their motion and exhibits as well as their motion to strike and objections.

Four days after their initial motion for leave, LIMC and Hollan filed a supplement to their motion for leave, attaching a verification by their counsel to support "Paragraphs 4, 5, and 10" and verification by their counsel's paralegal to support "Paragraph 6" of their motion. Eight days later, without having received a ruling on their earlier motion for leave, they filed an amended summary-judgment response but neglected to attach their evidence. They filed another response the next day, this time attaching their evidence.

The trial court heard the SOT Parties' motion to strike and objections to LIMC and Hollan's untimely summary-judgment response and evidence on November 3, 2021, and took their arguments under advisement.[23]

---

[23]At the hearing, the SOT Parties renewed their motion to strike the untimely-filed responses and their objections to LIMC and Hollan's summary-judgment evidence.

The next day, LIMC and Hollan filed an "omnibus response" to the ILS and Lawler Parties' summary-judgment motions, relying on the Administration Agreement attached to the motions, Hollan's unsworn declaration "submitted in Response to Plaintiffs' and Counter-Defendant's Motion for Summary Judgment," "Judicial Notice of the Pleadings on file in this matter," and "Judicial Notice of Texas Business Organizations Code, [S]ections 1.002(36) and 8.005."

In their response, LIMC and Hollan "concede[d] that there are, in the abstract, express negligence conspicuousness requirements for indemnity provisions, [but that] those requirements do not apply in the context of this case and in the context of the Administration Agreement." To support this argument, they relied on Business Organizations Code Section 8.005, which they argued "expressly excepts indemnity provisions contained in governing documents from the very legal requirements that [the ILS and Lawler Parties] now allege have not been satisfied," and Section 8.051, providing for mandatory indemnification of a governing person. They also argued that LIMC's claims were outside the express-negligence doctrine's scope if the doctrine applied. And they argued that a fact issue existed as to LIMC's right to enforce the Administration Agreement's indemnity provision and to mandatory indemnification. Aside from their Section 8.005 argument, they did not otherwise assert that fair-notice requirements did not apply, and they did not raise actual notice as an affirmative defense. LIMC and Hollan objected to some of the ILS and Lawler Parties' evidence

36

but expressly conceded "ILS and Blackburn's motion regarding the claim for monies had and received."

### e. Summary-judgment rulings

The trial court granted the ILS and Lawler Parties' motions,[24] making the rulings summarized below:

- Take-nothing and dismissal with prejudice on LIMC's indemnification claim against the ILS Parties and on LIMC and Hollan's money-had-and-received claim against the ILS Parties;

- LIMC's liability for the ILS Parties' breach-of-contract claim as to the Administration Agreement; and

- LIMC's liability for the Lawler Parties' conversion claim based on no duty to indemnify LIMC under the Administration Agreement.

The trial court expressly denied or overruled "all other requests, motions, or objections in the aforementioned briefing before the Court not specifically addressed herein."

On the same day, the trial court granted the SOT Parties' motion. The order's boilerplate language states, "The Court has reviewed the Motion and, having considered it and *any response*, reply, and oral argument of counsel, and otherwise being fully advised, the Court, in all things, Grants the Motion and provides the following orders[.]" [Emphasis added.] But although the order contained the same boilerplate

---

[24]The trial court's orders granting the ILS and Lawler Parties' motions stated that it granted the motions after "having considered [the motions] and *any response*, reply, and oral argument of counsel, and otherwise being fully advised." [Emphasis added.] We do not have a record of the hearing.

language as the ILS and Lawler Parties' summary-judgment orders regarding "any response" and the denial or overruling of "all other requests, motions, or objections in the aforementioned briefing before the Court not specifically addressed herein," unlike the ILS and Lawler Parties' orders, in an order signed the same day, the trial court granted the SOT Parties' motion to strike LIMC and Hollan's untimely summary-judgment response and evidence and sustained 39 objections to LIMC and Hollan's evidence "to the extent not already stricken from the record."

In its summary-judgment order, the trial court made the rulings summarized below:

- SOT and Bonham were each entitled to $975,000 of the $2 million Originator Bonus plus interest and, to the extent the policy proceeds were insufficient to fully pay these amounts, LIMC and Hollan were "jointly and severally liable to pay the outstanding amounts owed" to SOT and to Bonham;

- LIMC and Hollan lacked authority under the Operating Agreement to determine solely in their discretion the amount of distributions due, and the amounts owed were not subject to setoff, reduction, limitation, indemnification, or any other limitation under the Operating Agreement or applicable law; and

- The assignment from ILS to Bonham was valid and enforceable, but if it was invalid for any reason, then the amounts due to ILS or Bonham were to be immediately paid to ILS.

The trial court also awarded to SOT and Bonham a judgment "in the amount of $176,221.08 plus pre and post judgment interest for their claim of conversion" against LIMC and Hollan, jointly and severally, and awarded the same amount to SOT and Bonham for their money-had-and-received claim against LIMC and Hollan,

38

providing "that such judgment shall be inclusive of *and not in addition to the same amounts awarded for the claim of conversion.*" [Emphasis added.] The trial court awarded a take-nothing judgment on LIMC's claim for indemnification against SOT and on LIMC and Hollan's remaining state law claims against the SOT Parties and provided that the amounts awarded "shall accrue pre and post judgment interest at the highest applicable rate and that the prevailing party may seek reimbursement of its reasonable attorneys' fees and expenses at a later date."

### f. Subsequent proceedings

The SOT Parties sought entry of a final judgment; an award of $714,395.70 in attorney's fees and $25,361 in expenses under the Declaratory Judgments Act (DJA); prejudgment interest in the amount of $282,343.75;[25] postjudgment interest; and conditional appellate attorney's fees.[26]

Several months later, in May 2022, the trial court allowed LIMC and Hollan to substitute new counsel. Their new counsel moved for reconsideration of the SOT Parties' December 16, 2021 summary judgment, complaining that LIMC and Hollan's previous attorneys had failed to timely submit their response but also conceding that the untimely response was insufficient. LIMC and Hollan's new counsel argued that

---

[25]The SOT Parties initially calculated prejudgment interest at 5% from March 7, 2019, through the end of January 2022, but they subsequently reduced the requested amount.

[26]The ILS and Lawler Parties also filed a combined summary-judgment motion on damages, and the trial court awarded the amounts that they sought.

the SOT Parties' motion was also insufficient and that the trial court had granted summary judgment "by default." *Cf.* Tex. R. Civ. P. 166a(c).

LIMC and Hollan also asked the trial court at a minimum to "enter a revised order removing any reference to Mr. Hollan being jointly and severally liable in his individual capacity," and in their joint response to the other parties' motions for entry of final judgment and attorney's fees, they complained that imposing personal liability on Hollan for attorney's fees would be inequitable and unjust "given the facts surrounding Hollan's conduct in this case" and because he had acted in his corporate capacity, and no one had sought to pierce the corporate veil to hold him responsible for LIMC's contract-based debts and obligations. The trial court heard the motion to reconsider on August 12, 2022.[27]

## D. Final judgment

In its final judgment, the trial court recounted its earlier orders and restated that LIMC and Hollan would take nothing on their claims. The court then recited the same declarations in the earlier orders, making the following pertinent modifications:

- From the December 16, 2021 order, the trial court changed LIMC and Hollan's joint and several liability for any deficiency in the policy proceeds payable to SOT and to Bonham to LIMC's sole liability and clarified that "[a]ny and all amounts due to ILS or Bonham as an [O]riginator shall be due and owing to Bonham."

- The trial court corrected the $176,221.08 award to SOT and Bonham to reflect that LIMC, but not Hollan, would be liable "for their claims of conversion and money had and received."

_____

[27]We do not have a record of that hearing.

40

- To the SOT Parties, for prevailing on their declaratory-judgment claims, the trial court awarded—recoverable from LIMC—$788,051.20 in attorney's fees and $27,885.80 in expenses "as equitable and just compensation for amounts incurred in this matter," along with conditional appellate attorney's fees and costs, $274,038.89 in prejudgment interest, and postjudgment interest.

## E. Subsequent proceedings

On March 7, 2023, LIMC objected to the final judgment, asserting that:

- The Administration and Operating Agreements did not support it;

- Assigning $975,000 each to SOT and to Bonham without allocating any portion to the other originators misallocated the Policy proceeds;

- LIMC was entitled to indemnification from ILS under the Administration Agreement;

- The damages were not properly calculated; and

- The judgment purported to award prejudgment interest on funds that had been under the SOT Parties' control since October 16, 2020, and, to the extent it had been awarded, that prejudgment interest should have been calculated only from the initial notice of the action to October 16, 2020.

LIMC also filed a motion for new trial that day in which it complained about, among other things, material fact questions about whether "others" were entitled to a share of the Originator Bonus, the appropriate allocation of those funds, LIMC's entitlement to indemnification, and the conversion and money-had-and-received elements. LIMC also claimed that its tortious-interference claim had been for interference with business relations and not with contract such that the trial court should not have granted summary judgment to the SOT Parties on that claim.

41

The trial court heard LIMC's objections and motion for new trial on March 23, 2023. At the hearing, the trial court admitted into evidence the SOT Parties' proposed prejudgment-interest calculation chart from January 11, 2023, in which the SOT Parties' counsel stated that the revised interest rate calculation "reflect[ed] the decrease in amounts on which interest could accrue, using the date of the Court's ruling (December 16, 2021) as the cut-off date for amounts in [his] clients' possession," and the parties' January 2023 emails in which LIMC and Hollan's counsel indicated that he was "in agreement" with the proposed prejudgment-interest calculation.

The evidence also contained the parties' October 2020 emails committing to holding the funds "pending a resolution of the interference/wrongful execution claims"; Dean's bank statement dated December 31, 2021, showing his account held $897,417.55 (of which compound interest was $113.09); Bonham's certificate of deposit, opened December 30, 2020 for a six-month term (maturity date June 30, 2021), showing it held $897,224.55; and Bonham's certificate of deposit, opened June 30, 2021, for a twelve-month term, showing it held $900,583.05.

The chart showed that the outstanding Originator Bonus funds, from March 2019 to December 16, 2021, were $1.95 million and set out the accrued interest on that amount, accounting for interest-rate fluctuations between March and June 2019, July and September 2019, and October 2019 and December 16, 2021. The chart stated that as of December 16, 2021, the outstanding Originator Bonus funds were $156,239

through January 15, 2023, and set out the accrued interest on that amount, accounting for various interest-rate fluctuations between those dates. The total amount of prejudgment interest on the amount of Originator Bonus funds from March 2019 to December 16, 2021, based on these calculations, was $242,025.39, and the total amount of prejudgment interest on the conversion/money-had-and-received claim of $176,211.08—December 16, 2021 to January 15, 2023—was $32,013.50, using the same interest rates over the same time periods, for a total of $274,038.89—the amount awarded by the trial court in the final judgment and a recalculation (and reduction) from the $282,343.75 originally requested by the SOT Parties in January 2022.

LIMC and Hollan's counsel did not raise any objections to the prejudgment interest evidence or challenge that this evidence showed his agreement with those calculations. Instead, he agreed with the trial court's characterization that there was nothing else to talk about "other than just reopening the claims that were decided in summary judgment."

LIMC, the SOT Parties, and the ILS and Lawler Parties filed notices of appeal. The appeals were submitted via oral argument on April 23, 2024. The ILS and Lawler Parties subsequently moved to withdraw, and this court dismissed, their cross-appeal. *See Life Invs. Mgmt. Co. v. Settlements of Tex., Inc.*, No. 02-23-00151-CV, 2023 WL 5114983, at *1 (Tex. App.—Fort Worth Aug. 10, 2023, no pet.) (mem. op. & judgm't).

43

## III. Discussion

LIMC argues that the trial court improperly construed the Operating and Administration Agreements; erred by granting summary judgment for the SOT, ILS, and Lawler Parties; and erred by awarding prejudgment interest to the SOT Parties for the period after they took control of the Originator Bonus funds. In their cross-appeal, the SOT Parties complain that the trial court erred by eliminating Hollan's liability for damages for their conversion and money-had-and-received claims and for their attorney's fees and costs awarded under the DJA.

### A. Summary-judgment standard of review

We review a summary judgment de novo. *Travelers Ins. v. Joachim*, 315 S.W.3d 860, 862 (Tex. 2010). We consider the evidence presented in the light most favorable to the nonmovant, crediting evidence favorable to the nonmovant if reasonable jurors could, and disregarding evidence contrary to the nonmovant unless reasonable jurors could not. *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 848 (Tex. 2009). We indulge every reasonable inference and resolve any doubts in the nonmovant's favor. *20801, Inc. v. Parker*, 249 S.W.3d 392, 399 (Tex. 2008). A plaintiff is entitled to summary judgment on a cause of action if it conclusively proves all essential elements of the claim. *See* Tex. R. Civ. P. 166a(a), (c); *MMP, Ltd. v. Jones*, 710 S.W.2d 59, 60 (Tex. 1986). And a defendant (or counter-defendant) that conclusively negates at least one essential element of a plaintiff's (or counter-plaintiff's) cause of

action is entitled to summary judgment on that claim. *Frost Nat'l Bank v. Fernandez*, 315 S.W.3d 494, 508 (Tex. 2010); *see* Tex. R. Civ. P. 166a(b), (c).

## B. Late-filed responses and summary-judgment evidence

We must first consider what was properly before the trial court as summary-judgment evidence. *See Deloney v. Koscelnik*, No. 02-19-00433-CV, 2020 WL 7252316, at *3 (Tex. App.—Fort Worth Dec. 10, 2020, no pet.) (mem. op.) (addressing appellant's failure to obtain leave to file a late response).[28]

### 1. Summary-judgment responses

A nonmovant generally must expressly present to the trial court any reasons for avoiding the movant's right to summary judgment. *McConnell v. Southside ISD*, 858 S.W.2d 337, 343 (Tex. 1993); *see* Tex. R. Civ. P. 166a(c) ("Issues not expressly presented to the trial court by written motion, answer or other response shall not be considered on appeal as grounds for reversal."); *D.R. Horton-Tex., Ltd. v. Markel Int'l Ins.*, 300 S.W.3d 740, 743 (Tex. 2009) ("A non-movant must present its objections to a summary judgment motion expressly by written answer or other written response to

---

[28]In its opening brief, LIMC does not argue that the trial court abused its discretion by denying LIMC's request to late-file its summary-judgment response to the SOT Parties' final summary-judgment motion, by striking the response, or by sustaining the SOT Parties' evidentiary objections. In its reply brief, LIMC argues that it preserved its objection to the trial court's lack of consideration of its late-filed response "both in oral argument at a hearing on the Motion to Strike and in its Motion to Reconsider" but contends that "even if the Court cannot consider the evidence submitted with Appellant's response to the SOT Parties' motion for summary judgment, the District Court's order and Final Judgment granting summary judgment in the SOT Parties' favor is not supported by the [SOT Parties'] own motion and evidence."

45

the motion in the trial court or that objection is waived."). No response is necessary, however, when the movant's summary-judgment proof is legally insufficient. *See Rhone-Poulenc, Inc. v. Steel*, 997 S.W.2d 217, 223 (Tex. 1999). The nonmovant's failure to answer or respond cannot supply by default the summary-judgment proof necessary to establish the movant's right because summary judgments must stand on their own merits. *Id.* But while the nonmovant need not file a response to the summary-judgment motion, the nonmovant who does not file a response may contend on appeal *only* that the movant's evidence supporting the motion was insufficient as a matter of law or that the grounds in the motion do not dispose of all the claims in the case. *City of Houston v. Clear Creek Basin Auth.*, 589 S.W.2d 671, 678 (Tex. 1979).

### 2. Summary-judgment record

Where nothing appears of record to indicate that a late filing of a summary-judgment response was with leave of court, we presume that the trial court did not consider the response. *B.C. v. Steak N Shake Operations, Inc.*, 598 S.W.3d 256, 259 (Tex. 2020) (op. on reh'g). The record must be reviewed for an affirmative indication that the trial court permitted the late filing, and that affirmative indication may arise from a separate order, a recital in the summary judgment, or an oral ruling contained in the reporter's record of the summary-judgment hearing. *Id.* at 259–60. In *B.C.*, the supreme court held that a recital that the trial court considered the "evidence and arguments of counsel," without any limitation, was an affirmative indication that it had considered the late response and evidence attached to it. *Id.* at 261. That is, "a

46

court's recital that it generally considered 'evidence'—especially when one party objected to the timeliness of all of the opposing party's evidence—overcomes the presumption that the court did not consider it" if that recital is not qualified or otherwise limited. *Id.* at 261–62.

In contrast, in *Deloney*, we did not consider a late-filed amended response or the unsworn documents attached to it as part of the summary-judgment record when the record did not show that the trial court had granted leave for the late-filed response or that it had otherwise considered it. 2020 WL 7252316, at *4 (noting that the summary-judgment order stated that the trial court considered "the pleadings, the motion, the evidence on file, and arguments of the parties"); *see Byrd v. Vills. of Woodland Springs Homeowners Ass'n, Inc.*, No. 02-23-00078-CV, 2024 WL 3529431, at *2 n.6 (Tex. App.—Fort Worth July 25, 2024, no pet.) (mem. op.) (inferring under *B.C.* that the trial court did not consider appellant's evidence when, even though the trial court's final judgment and amended final judgment stated that it considered "the Motion, the evidence attached thereto, any response, and the arguments of counsel (if any)," the trial court did not mention the appellant's evidence and specifically wrote into the judgment and amended judgment that the appellant had not filed a timely response under Rule 166a(c) and "[t]hus, the MSJ is Granted").

Here, the trial court's express order signed on the same day as its summary-judgment order indicates that LIMC and Hollan's untimely summary-judgment response was not considered and that their untimely evidence had been struck,

47

narrowing the summary-judgment record before us for LIMC's issues relating to the SOT Parties to the sufficiency of the SOT Parties' summary-judgment motion and evidence. *See Rhone-Poulenc*, 997 S.W.2d at 223; *Clear Creek Basin*, 589 S.W.2d at 678.

However, the trial court's orders on the ILS and Lawler Parties' motions reflect that it considered "any response" and that "all other requests, motions, or objections in the aforementioned briefing before the Court not specifically addressed herein" were denied or overruled. Accordingly, we infer under *B.C.* that the trial court considered LIMC and Hollan's omnibus response but did not take the judicial notice they requested in the response of "the Pleadings on file in this matter"[29] or of Business Organizations Code Sections 1.002(36) and 8.005, and that it overruled LIMC and Hollan's objections to Blackburn's unsworn declaration.

Further, although LIMC and Hollan listed as part of their summary-judgment evidence the "Declaration of Terry Hollan submitted in Response to Plaintiffs' and Counter-Defendant's Motion for Summary Judgment," they did not specify whether they meant Hollan's first declaration, which was attached to LIMC's response to the SOT Parties' first motion, and which did not address the indemnification clause upon which the summary-judgment motion was based, or his second declaration, attached

---

[29]To the extent LIMC and Hollan attempted to rely on their own pleadings—including any attachments thereto—those did not constitute competent summary-judgment evidence. *See Laidlaw Waste Sys. (Dall.), Inc. v. City of Wilmer*, 904 S.W.2d 656, 660 (Tex. 1995); *see also Regency Field Servs., LLC v. Swift Energy Operating, LLC*, 622 S.W.3d 807, 819 (Tex. 2021) ("[A] party cannot rely on its *own* pleaded allegations as evidence of facts to support its summary-judgment motion or to oppose its opponent's summary-judgment motion." (footnote omitted)).

to his late-filed response to the SOT Parties' third motion and struck by the trial court. Thus, the record reflects that the only summary-judgment evidence potentially considered as relevant by the trial court in LIMC and Hollan's omnibus response to the ILS and Lawler Parties' summary-judgment motions was the Administration Agreement, which LIMC and Hollan had incorporated as attached "to each of the Movants' Motions for Summary Judgment."

## C. Contract construction

LIMC's first two issues challenge, respectively, the trial court's construction of the Administration and Operating Agreements. Contract construction's primary goal is to effectuate the parties' intent as expressed in the contract. *Monroe Guar. Ins. Co. v. BITCO Gen. Ins. Corp.*, 640 S.W.3d 195, 198–99 (Tex. 2022). That is, a contract's plain language controls, its words must be construed in context, and the entire writing must be examined and considered in an effort to harmonize and give effect to all of the contractual provisions so that none will be rendered meaningless. *In re Whataburger Rests. LLC*, 645 S.W.3d 188, 194–95 (Tex. 2022) (orig. proceeding). Courts will not rewrite agreements to insert provisions that parties could have included or to imply restraints for which they have not bargained. *Am. Midstream (Ala. Intrastate), LLC v. Rainbow Energy Mktg. Corp.*, 714 S.W.3d 572, 574 (Tex. 2025) (quoting *Tenneco Inc. v. Enter. Prods. Co.*, 925 S.W.2d 640, 646 (Tex. 1996)).

We "regularly enforce unambiguous contract language agreed to by sophisticated parties in arms-length transactions." *James Constr. Grp., LLC v. Westlake*

*Chem. Corp.*, 650 S.W.3d 392, 403 (Tex. 2022). If, however, an ambiguity is present, we may consider evidence of surrounding circumstances that inform, rather than vary from or contradict, the contract's text. *RPC, Inc. v. CTMI, LLC*, 606 S.W.3d 469, 485 (Tex. App.—Fort Worth 2020, pet. denied) (mem. op.) (citing *URI, Inc. v. Kleberg Cnty.*, 543 S.W.3d 755, 767 (Tex. 2018)). Consideration of the surrounding facts and circumstances is simply an aid in construing the contract's language. *Plains Expl. & Prod. Co. v. Torch Energy Advisors Inc.*, 473 S.W.3d 296, 305 (Tex. 2015).[30]

## 1. The Operating Agreement

LIMC argues that "[a]t a minimum there are material questions of fact regarding who the Originators are and thus who was entitled to share in the funds and what the appropriate allocation would be."

---

[30]The Operating Agreement is governed by Missouri law; the Administration Agreement is governed by Texas law. We cite to Texas law here as there are no pertinent substantive distinctions between the two. *See, e.g.*, *Arrowhead Lake Ests. Homeowners Ass'n v. Aggarwal*, 624 S.W.3d 165, 167 (Mo. 2021) ("When a contract is unambiguous, the intent of the contract is discerned solely from the contract's language."); *Trs. of Clayton Terrace Subdivision v. 6 Clayton Terrace, LLC*, 585 S.W.3d 269, 280 (Mo. 2019) (stating that to ascertain the parties' intent, "courts give the words of the contract their 'natural, ordinary, and common sense meaning'" and that the contract's terms "are read as a whole to determine the intention of the parties"). Under Missouri law, a contract is ambiguous when the language is reasonably susceptible to two or more interpretations. *Patterson v. Rough Rd. Rescue, Inc.*, 529 S.W.3d 887, 894 (Mo. Ct. App. 2017) (stating under Missouri law that "[t]o aid in construing an ambiguous contract, recourse must be had to evidence of the relationship of the parties, the circumstances surrounding execution of the contract, the subject matter of the contract, the acts of the parties in relation to the contract, and any other external circumstances that cast light on the intent of the parties").

The Operating Agreement provided for the division of $2 million among "Originators for the LLC (the names of which are [ILS], [SOT], Compass Life, LLC, *and others) engaged by the LLC to provide*[] *services to the LLC to assist with the capitalization of the LLC and the implementation of the LLC's investment strategy*," and that the Originators would

> apportion between them [the $2 million] *according to their separate agreement(s)*. ([ILS], [SOT], and Compass Life, LLC, have agreed that the interest of Compass Life, LLC, will be in the amount of $50,000, and that [ILS] and [SOT] will divide the remainder of the Originators interest between them *and others who have provided services to the LLC for the implementation of its strategy*. [Emphases added.][31]

### a. Capitalization and strategy

Under the Operating Agreement's plain language, to be one of the "other" Originators, an entity or individual had to be engaged by WL McIntyre LLC to provide "services" to it "to assist" with its capitalization and "the implementation of [its] investment strategy." The SOT Parties' summary-judgment evidence showed how WL McIntyre LLC's investment strategy worked and showed that the only WL McIntyre LLC Originators at the time of WL McIntyre LLC's dissolution[32] were ILS, SOT, and Compass Life.

---

[31]Mathematically, if there were only three Originators, and one of the three was allocated $50,000, then the other two Originators would divide the remaining $1,950,000, at $975,000 each.

[32]WL McIntyre LLC existed to hold McIntyre's life insurance policy. At McIntyre's death—the Operating Agreement's "Mandatory Repurchase Event"—the entity would be required to identify its distribution's recipients so that it could

Further, that evidence also showed that while ILS engaged LIMC in the Administration Agreement on behalf of WL McIntyre LLC and 179 other Policy LLCs, that engagement was for the companies' day-to-day business administration through collecting fees from the Policy LLCs and paying their operational expenses. Nothing in the Administration Agreement's "Delegation of Powers and Authorities" section specifically addressed any individual Policy LLCs' capitalization or investment-strategy implementation.

LIMC did not allege—and does not argue on appeal—that it was a WL McIntyre LLC Originator, and it produced no evidence that Hollan or the alleged "other" originators listed in their counterpetition and in their appellate brief—GTH Holdings, Reynolds, Black, Worley, Hutcheson, Stanley, McNamara, Clenney, Freeman, and Hentges—were ever "engaged by" WL McIntyre LLC "to provide[] services to the LLC to assist with the capitalization of the LLC and the implementation of the LLC's investment strategy." The record contains no such engagement documents for these alleged "others." Rather, the SOT Parties' summary-judgment evidence showed that these were all Investor Member originators, making them at least once removed from the WL McIntyre Operating Agreement:

---

dissolve, wind-up, and liquidate; at that point, it would be both too late and counterproductive to add Originators to provide services to assist with capitalization and implementation of WL McIntyre LLC's investment strategy.

52

- Hutcheson and Black were originators of MAC D2 and MAC D3;

- GTH Holdings (sometimes identified as Hollan) and Clenney were originators of MAC Interests 2;[33]

- Stanley, Reynolds, Worley, and Freeman were originators of MAC Interests 4 and MAC S1; and

- Hentges was an originator of MAC S1.

Regarding Hollan's testimony that he was a "funder," he admitted that the loans had been repaid. Regarding his testimony that he had raised capital, the SOT Parties' documentary evidence showed how he raised funds and capital and when but did not specifically identify him as one of the "other" Originators or that he had a separate agreement with ILS, SOT, and Compass Life—the listed Originators—that made him an "other" entitled to a share of the Originator Bonus. Thus, his testimony that he was a "funder" and that he raised capital did not raise a fact issue about whether he was an Originator.

### b. No Operating Agreement amendment for "others"

The language used in the Operating Agreement left room for the *possibility* of other Originators until WL McIntyre LLC's dissolution as defined elsewhere in the agreement. The parties to the Operating Agreement were McIntyre, WL McIntyre

---

[33]There appears to be a conflict between whether Clenney was an originator of MAC Interests 2 as listed in the entity's operating agreement versus one of its new business sheets, on which someone wrote that "Clenney is not an originator on this one." For our purposes, however, this conflict is irrelevant as it does not raise a genuine issue of material fact as to the identity of "other" Originators under the WL McIntyre LLC Operating Agreement.

LLC, ILS, and the eight Investor Members, which had their own originators and members. At the time the Operating Agreement was executed, LIMC did not exist, and Hollan was never a party to the Operating Agreement but rather the managing member of GTH Holdings, which was an originator of MAC Interests 2, one of WL McIntyre LLC's Investor Members. In their discovery responses, LIMC and Hollan admitted that they were not signatories to the Operating Agreement.

Hollan admitted in his deposition as LIMC's corporate representative that the Operating Agreement had not been amended to identify any "others," and in their discovery responses, LIMC and Hollan admitted that there was no written amendment to the Operating Agreement that identified any Originators or "others" besides ILS, SOT, and Compass Life.

### c. Alleged "Diversion Agreement" was not summary-judgment evidence

Undaunted by the trial court's unchallenged evidentiary rulings, LIMC attempts to rely on the "Diversion Agreement" that it attached to its counterclaim, its second amended counterclaim, and its late-filed summary-judgment response. *See* Tex. R. Civ. P. 59. But the alleged "Diversion Agreement" has no bearing on our analysis because

- LIMC failed to timely file its summary-judgment response and evidence to the SOT Parties' final summary-judgment motion—the only time besides its pleadings that LIMC attempted to introduce this document into evidence;

- The trial court struck the evidence attached to that summary-judgment response; and

- LIMC does not argue in its opening brief in this appeal that the trial court abused its discretion by striking that evidence.[34]

---

[34]In its reply brief, LIMC—for the first time—asserts that we should consider the Diversion Agreement, referring us to its counsel's reading a portion of it at the November 3, 2021 summary-judgment hearing and the summary-judgment order's stating that the trial court considered the "oral argument of counsel." But counsel's statement is not summary-judgment evidence. *See* Tex. R. Civ. P. 166a(c) ("No oral testimony shall be received at the hearing."); *McAllen Hosps., L.P. v. State Farm Cnty. Mut. Ins. Co. of Tex.*, 433 S.W.3d 535, 542 (Tex. 2014) ("Although counsel for the parties briefly addressed the issue at oral argument in response to questions from the Court, that discussion was insufficient to preserve for our review a ground that was not raised in State Farm's summary judgment motion."). LIMC's argument also ignores the trial court's order, signed the same day, in which it struck LIMC's response and summary-judgment evidence and sustained the SOT Parties' evidentiary objections.

LIMC also argues in its reply brief that the SOT Parties attached as an exhibit LIMC's response to their first summary-judgment motion, which included Hollan's initial unsworn declaration, and that "[w]ithin that declaration are multiple references to the Diversion Agreement." However, LIMC did not attach the Diversion Agreement to its response to that motion, and that response focused primarily upon the Operating and Administration Agreements and the "Purported Termination Letter." As set out above, paragraph 32 in Hollan's 36-paragraph unsworn declaration merely referenced "the collusive Diversion Agreement" but did not explain its contents or origin beyond his assertion that some originators—unnamed—had not agreed to it and had been excluded from it. Without more, this reference is insufficient to raise a genuine fact issue when compared against the SOT Parties' summary-judgment evidence—particularly the Investor Members' originator documentation—even if we were required to consider an argument raised for the first time in a reply brief. *See* Tex. R. App. P. 38.3 (stating that the appellate court "may consider and decide the case before a reply brief is filed"); *see also In re R.H.*, No. 02-24-00195-CV, 2025 WL 52124, at *3 (Tex. App.—Fort Worth Jan. 9, 2025, no pet.) (mem. op.) (refusing to consider argument raised for the first time in reply brief); *Holdridge v. Wallace Ryne, O.D., P.C.*, No. 02-23-00420-CV, 2024 WL 3455838, at *7 n.16 (Tex. App.—Fort Worth July 18, 2024, no pet.) (mem. op.) ("A party may not use its reply brief to raise new issues.").

Because the trial court struck LIMC's late-filed summary-judgment response and evidence, LIMC cannot avoid the effect of this order by arguing that somewhere in the record was a document raising a fact issue.[35]

Based on this summary-judgment record, the trial court did not err in its construction of the Operating Agreement and identification of WL McIntyre LLC's Originators. We overrule LIMC's second issue.

### 2. The Administration Agreement

LIMC contends that the summary-judgment evidence did not support finding that the Administration Agreement was terminated and that LIMC thus remained WL McIntyre LLC's Administrator. Because the termination ground is dispositive of this issue, we need not reach LIMC's remaining arguments. *See* Tex. R. App. P. 47.1.

The Administration Agreement, which was executed a few months after LIMC was created, stated it would terminate as follows: the first to occur of either (1)

---

[35]In its omnibus response to the ILS and Lawler Parties' summary-judgment motions, LIMC asked the trial court to take judicial notice of "the Pleadings on file in this matter," but even if the trial court had considered the request, "[g]enerally, pleadings are not competent evidence, even if sworn or verified." *Laidlaw Waste Sys. (Dall.), Inc.*, 904 S.W.2d at 660; *see Regency Field Servs., LLC*, 622 S.W.3d at 819 (stating that a party cannot rely on its own pleaded allegations as evidence of facts to oppose its opponent's summary-judgment motion); *see also* Hon. David Hittner, Lynne Liberato, et al., *Summary Judgments in Texas: State and Federal Practice*, 62 S. Tex. L. Rev. 99, 166–68 (2022) (explaining circumstances under which an *opponent*'s pleadings may constitute summary-judgment proof). And LIMC's omnibus response—which, again, was responding to two different summary-judgment motions addressing different claims—did not cite or incorporate the Diversion Agreement and did not rely on it, even if it could be considered in evaluating the SOT Parties' summary-judgment motion.

dissolution *or* termination of a particular Policy LLC under the Policy LLC's operating agreement *or* applicable law *or* (2) the parties' written agreement to terminate. It is undisputed that the parties did not exercise the last option. LIMC argues that the first termination ground also did not occur.

The Administration Agreement also specifically provided that it was "subject to" each Policy LLC's operating agreement. Thus, we must construe the Administration and Operating Agreements together to determine whether LIMC is correct that the trial court could not have found that another termination ground— the dissolution or termination of WL McIntyre LLC under the Operating Agreement—had occurred.

WL McIntyre LLC's Operating Agreement defined "dissolution" in two places: (1) the occurrence of McIntyre's death—a "Mandatory Repurchase Event"—which occurred on July 5, 2018; and (2) "the cessation of its normal business activities and the *beginning* of the process of winding up its business and internal affairs and of liquidating it." [Emphasis added.] As reflected in the record, except for the dispute over the Originator Bonus, the remaining distributions had been made by the time the SOT Parties sued on April 30, 2019, indicating that normal business activities had ceased and that winding up had begun. As defined under the Operating Agreement, "[t]he winding-up of the LLC [via] . . . the process of concluding its existing business activities and preparing for its liquidation" is the stage *after* "Dissolution."

Because the Operating Agreement's terms govern the Administration Agreement's termination, and because, under the Operating Agreement, WL McIntyre LLC was required to dissolve—defined as *beginning* the process of winding up and liquidating—upon McIntyre's death, the Administration Agreement—a day-to-day-business agreement—effectively ended as to WL McIntyre LLC on or immediately after McIntyre's death on July 5, 2018.[36] At that point, LIMC's authority over WL McIntyre LLC reverted to ILS[37] to take whatever actions necessary to complete the Operating Agreement's dissolution, winding-up, and liquidation steps. The trial court did not err by determining that LIMC no longer had the right to administer WL McIntyre LLC, and we overrule LIMC's first issue.

## D. Other summary-judgment claims

In its third issue, LIMC argues that the trial court erred by granting the SOT Parties' summary judgment on the remaining claims, including LIMC's counterclaims. In its fourth and fifth issues, it argues that the trial court erred by granting the ILS and Lawler Parties' summary judgments, respectively.

---

[36]In his September 25, 2020 unsworn declaration attached to his response to the SOT Parties' first motion for partial summary judgment, Hollan stated that WL McIntyre LLC had "not been *completely* dissolved," implicitly acknowledging that dissolution had begun. [Emphasis added.]

[37]Whether LIMC's continued performance under the Administration Agreement—up to the date the SOT Parties sued, or beyond, to the date of the "Purported Termination Letter"—would result in a quantum meruit claim for services rendered is not an issue that was raised in the trial court or argued in this appeal.

**1. SOT Parties' summary judgment on their state law claims**

LIMC contends that because the trial court incorrectly construed the Administration Agreement and incorrectly awarded the Originator Bonus, it also improperly granted summary judgment on the SOT Parties' conversion and money-had-and-received claims and that because the SOT Parties "were not entitled to the declarations made regarding their entitlement to funds, they could not prove their state law claims as a matter of law." LIMC further argues that the trial court erroneously granted summary judgment to the SOT Parties on their complaint that LIMC had converted $176,221.08 in administrative fees, challenging the award's evidentiary sufficiency.

As set out above, the trial court did not misconstrue the Administration Agreement or incorrectly award to SOT and ILS their shares of the Originator Bonus. We overrule this portion of LIMC's third issue. The remainder of this issue requires clarifying what was awarded and how.

## a. The SOT Parties' live pleading

In their live pleading, the SOT Parties complained that LIMC and Hollan had converted $156,152.21 based on bank account documents showing "that there is $156,152.21 less than the minimum required $1,950,000 . . . in the bank account to pay both Plaintiffs" and that in August 2018, LIMC and Hollan had "transferred [c]ompany assets that belonged to [the SOT Parties] and/or the Manager to

themselves." They also pleaded a money-had-and-received claim "in the alternative to [their] declaratory judgment claims."

### b. SOT's third summary-judgment motion

In contrast to their live pleading, in their third summary-judgment motion, filed almost a year later, the SOT Parties argued that their "claims for conversion and money had and received stem[med] from LIMC's decision to abscond $176,221.08 from the Company's bank account when it admits to having no legal basis for doing so," which was improperly taken "as putative administrative fees when LIMC admits it was already paid in full on its administrative fees" *and* that they were owed $156,223.99 (the difference between the $1,950,000 plus interest they were owed and the $1,793,776.01 they had received, "which ha[d] been held frozen").[38]

To support their motion, in addition to the already discussed evidence establishing their entitlement to the Originator Bonus, the SOT Parties referred the trial court to the following excerpts from Hollan's corporate-representative testimony in his July 12, 2021 deposition:

- LIMC was a billing and collecting company that collected fees annually as part of the insurance premium, and an investor would get a ROI schedule showing

---

[38]In a discovery response attached to the SOT Parties' first summary-judgment motion, LIMC and Hollan admitted to paying out $156,240 from the Originator Bonus, not $156,223.99. The difference, however, is minimal ($16.01) and merely accounts for where the money went and to whom but otherwise provides no evidence to support LIMC and Hollan's assertions that the recipients were "others" or that "capital calls in advance" counted as services "engaged by the LLC . . . to assist with the capitalization of the LLC and the implementation of the LLC's investment strategy" as opposed to obligations under the Investor Member operating agreements.

premium or capital obligations and how much was being paid annually in administration, but when asked about the $141,000, Hollan characterized it as "back administration fees" and agreed that the amount was in addition to the annual administration fees. He also stated, "I already told you I raised the fees," and stated, "So now you know I raised the fees";

- LIMC raised the amount of administration fees on its own accord without discussing it with anyone else;

- In June 2018, LIMC paid $12,100 to the insurance company, reducing the amount in the account to $176,231. McIntyre died the next month, and the account dropped from $176,231 to $10 through two transactions;

- In his corporate-representative deposition, Hollan testified that $140,000 of the $176,231 was "to pay the back administration fees that hadn't been collected yet," and $35,000 of the $176,231 was "to close out all the subpartnerships with the accountant in Amarillo," but when asked if any of the $35,000 remained with LIMC, Hollan replied, "It could have."

The SOT Parties also referred the trial court to Section 2.8 of the Operating Agreement, which states that no member had a duty to make a contribution to the LLC except as provided in the Agreement for Formation of Investment LLC and Acquisition of LLC Membership Interests, the Operating Agreement, or Exhibit B (which set out each investor's contribution value and date of contribution) and that the Investor Members agreed "to pay their proportionate share of the required additional annual capital contributions, when demanded, as provided herein." And they directed the trial court to Section 11.1(b) of the Operating Agreement, which—upon McIntyre's death—required distribution of the balance of LLC assets, if any, to the Manager Member after all distributions were made and any LLC liabilities had been paid.

61

To their motion, the SOT Parties also attached WL McIntyre LLC's bank account statement showing payment of $35,000 on August 23, 2018, and payment of $141,221.08 on August 28, 2018—a total of $176,221.08—leaving a balance of $10.[39] They attached the November 21, 2019 "purported termination" letter to Hollan in which Blackburn stated, "It has come to my attention that you have withheld distributions from the proceeds of the W.L. McIntyre life insurance policy[,] have not properly accounted for all receipts to and distributions from the LLC[,] and are improperly collecting administrative fees," and demanded the return of WL McIntyre LLC's assets, books, records, receipts, and related documents, as well as the transfer of the funds in the ANB account. And they attached their live pleading in which they stated their claims for conversion and money had and received but did not specifically identify the $176,221.08 claim.

### c. Summary-judgment hearing

At the November 3, 2021 summary-judgment hearing, the SOT Parties' counsel muddied the waters (and the math), stating,

> Conversion and money had [and received] are essentially the same thing. They're based on the same ultimate theories of fact, and that's this: There should be 1[.]95 plus interest paid over to [the SOT Parties]. That's not what's in the account. The account only has half of that, 1.79. There's a shortfall. *And the shortfall can be entirely contributed to this $176,221 that was swept out of the account by LIMC.* And they swept it out of the account right after Mr. McIntyre died, right before the policy is about to get funded. [Emphasis added.]

[39]The bank statement did not show to whom the $35,000 and the $141,221.08 were paid other than "ECORP XFER" to the same checking account number.

### d. Summary-judgment order

In its December 16, 2021 summary-judgment order, the trial court ordered an award of $176,221.08 on the conversion claim and awarded the same amount on the money-had-and-received claim as inclusive of "and not in addition to the same amounts awarded for the claim of conversion," apparently acknowledging—to prevent a double recovery—that the same amount had been sought on these bases in the summary-judgment motion. In the February 6, 2023 final judgment, the trial court awarded $975,000 each to SOT and Bonham, with LIMC liable for any deficiency, and to the SOT Parties "$176,221.08 for their claims of conversion *and* money had and received" and $274,038.89 in prejudgment interest. [Emphasis added.]

### e. Prejudgment-interest evidence

In their prejudgment-interest chart, which was admitted into evidence without objection at the hearing on LIMC's motion for new trial, the SOT Parties showed the remaining outstanding amount of the Originator Bonus as $156,239 after December 16, 2021, *and* showed a deficiency of $176,221.08 for "Conversion and Money Had and Received Outstanding," to support a total amount of $274,038.89 in prejudgment interest.

### f. Conclusion: Unpleaded but unobjected-to claims

As set out above, although neither party addresses it, the SOT Parties presented unpleaded conversion and money-had-and-received claims for $176,221.08

in their summary-judgment motion. An unpleaded claim may serve as a basis for summary judgment when it is raised in the motion and the opposing party does not object to the lack of pleading either in its written response or before rendition of judgment. *Roark v. Stallworth Oil & Gas, Inc.*, 813 S.W.2d 492, 494–95 (Tex. 1991); *Finley v. Steenkamp*, 19 S.W.3d 533, 541 (Tex. App.—Fort Worth 2000, no pet.); *see Goodyear Tire & Rubber Co. v. Mayes*, 236 S.W.3d 754, 756 n.1 (Tex. 2007).

LIMC and Hollan's late-filed summary-judgment response and evidence were struck, and they have not appealed that decision. LIMC and Hollan did not challenge the unpleaded claims in their motion to reconsider the summary-judgment order other than to challenge the sufficiency of the evidence to support them and did not otherwise challenge the lack of pleadings to support the claims before or after the trial court rendered final judgment.

In its motion for new trial, LIMC did not complain about the unpleaded claims and instead argued that the SOT Parties could not establish as a matter of law that they were entitled to any specific portion of the Originator Bonus and that the SOT Parties had failed to establish "two essential elements of the conversion claim—first, that they were entitled to possession of the $176,221.08 paid to Defendants in administration fees, and second, that Defendants' exercise of control over those funds was inconsistent with any rights of Plaintiffs." Regarding the money-had-and-received claim, LIMC argued,

The Court erred in accepting Plaintiffs' argument for judgment on the money[-]had[-]and[-]received claim upon the unfounded premise that Defendants were not entitled to the administrative fees at issue in the conversion claim. . . . For the same reasons outlined above, there are material questions of fact that were raised by the summary judgment evidence, which made the Court's judgment on this claim erroneous.

The SOT Parties' summary-judgment evidence showed that they had a legal interest in (1) the difference between the $1.95 million owed and the $1,793,776.01 received ($156,223.99) and (2) $176,221.08 in extra administration fees over which LIMC and Hollan had exercised control without authorization and inconsistent with the SOT Parties' rights, that the SOT Parties had demanded their money's return, and that LIMC had refused. *See Henson v. Reddin*, 358 S.W.3d 428, 435 (Tex. App.—Fort Worth 2012, no pet.) (setting out conversion elements); *see also Norhill Energy LLC v. McDaniel*, 517 S.W.3d 910, 917 (Tex. App.—Fort Worth 2017, pet. denied) (identifying money had and received's two elements as (1) the defendant holds money and (2) the money in equity and good conscience belongs to the plaintiff). Accordingly, because LIMC and Hollan did not object to the unpleaded conversion and money-had-and-received claims for $176,221.08 in the SOT Parties' motion, and the SOT Parties supported these unpleaded claims with sufficient summary-judgment evidence, the trial court did not err by granting summary judgment on them. *See Roark*, 813 S.W.2d at 494–95. Further, the trial court did not err in its final judgment by declaring that SOT and Bonham were each entitled to $975,000 plus interest and that LIMC "shall be liable to pay the outstanding amounts owed," which would have

65

been the difference between the $1.95 million owed and the amount actually received, identified in the SOT Parties' third amended petition's conversion claim and in their prejudgment interest chart. On the record before us, LIMC has failed to raise a genuine issue of material fact as to any of these claims, and we overrule this portion of its third issue.

### 2. SOT's summary judgment on LIMC's remaining state law claims

In the rest of its third issue, LIMC argues that the trial court erred by granting summary judgment for the SOT Parties on its claims for indemnification, money had and received, tortious interference, wrongful execution, and abuse of process.

### a. Indemnification

LIMC sought indemnification under Articles 4 and 10 of the Administration Agreement, based on the "litigation . . . commenced by Counter-Defendant SOT . . . against Counter-Plaintiff LIMC in its role as Administrator, to keep LIMC from carrying out its obligations to apportion and disburse the Originator Bonus to all of the Originators." LIMC sought indemnification "for any and all claims, losses, judgments, damages, expenses, court costs, attorneys' fees and liabilities arising from or in any way related to the claims asserted in this suit." Because the Administration Agreement terminated as to WL McIntyre LLC when McIntyre died and before the lawsuit began, LIMC had no basis for this claim against SOT, which was appointed Manager after the lawsuit began, and we overrule this portion of LIMC's third issue.

### b. Money-had-and-received claim and the Originator Bonus

LIMC also complained that the SOT Parties had improperly diverted at least $800,000 of the Originator Bonus. Because we have concluded that the trial court did not err by granting the SOT Parties' summary judgment on the Originator Bonus's distribution, the trial court likewise did not err by granting summary judgment on LIMC's money-had-and-received claim, and we overrule this portion of LIMC's third issue.

### c. Tortious interference

LIMC argues that the SOT Parties' motion focused on tortious interference *with contract*, while its claim was for tortious interference *with business relations*, making the elements listed in the SOT Parties' motion the inappropriate measure by which to judge the counterclaim. However, both claims require a showing of causation and actual damages. *See Mignogna v. Funimation Prods., LLC*, No. 02-19-00394-CV, 2022 WL 3486234, at *14 (Tex. App.—Fort Worth Aug. 18, 2022, pet. denied) (mem. op.) (citing first *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 207 (Tex. 2002) (op. on reh'g), and then *Coinmach Corp. v. Aspenwood Apt. Corp.*, 417 S.W.3d 909, 923 (Tex. 2013)). And a defendant that conclusively negates at least one essential element of a plaintiff's cause of action is entitled to summary judgment on that claim. *Frost Nat'l Bank*, 315 S.W.3d at 508; *see* Tex. R. Civ. P. 166a(b), (c). Further, although a trial court errs by granting summary judgment on a cause of action not expressly presented by written motion, the error is harmless when the motion asserts grounds that bar the omitted

cause of action as a matter of law. *Endeavor Energy Res., L.P. v. Cuevas*, 593 S.W.3d 307, 312 (Tex. 2019).

In its second amended counterclaim, LIMC and Hollan attempted to add GTH Holdings and lumped in a single cause of action under the heading "wrongful execution/abuse of process/tortious interference." Under this claim, LIMC, Hollan, and GTH Holdings alleged that they had maintained an "extremely favorable" relationship with ANB for 38 years and that, on or about October 18, 2020, the SOT Parties approached ANB and used the trial court's October 16, 2020 interlocutory order to seize the Originator Bonus funds and that this led to ANB's "terminat[ing] all banking and financial relationships with . . . Hollan, GTH [Holdings,] and LIMC, including all lending relationships with [them]." They complained that this constituted "wrongful execution, abuse of process[,] and tortious interference" with their banking and lending relationship. On June 2, 2021, the trial court severed GTH Holdings and its claims from the instant case.

In their subsequent motion, the SOT Parties set out the elements for tortious interference with contract, pointed out the summary-judgment evidence that supported their having obtained the funds from ANB "as a result of the bank's independent assessment" as to the funds' rightful holder, and argued that the evidence showed no willful or intentional act by the SOT Parties to affect any dealings between ANB and LIMC and Hollan, no proximate cause, and no damages, relying on deposition excerpts from ANB's general counsel and Hollan.

68

Clint Latham, ANB's general counsel, testified in a March 29, 2021 corporate-representative deposition that ANB had reviewed copies of the Operating and Administration Agreements as well as the documents appointing SOT as WL McIntyre LLC's new manager and Dean as its exclusive authorized user and account signatory and had concluded that the account should be in Dean's control and not in LIMC or Hollan's control. Latham stated that ANB would have given control of the account to Dean in January or February 2020 if LIMC had not threatened that if ANB gave control of the account to Dean, it would "take appropriate action against all persons and entities involved." Because of the threat, ANB temporarily froze the account until it was provided with the trial court's partial summary-judgment order, which ANB understood was interlocutory. Because the order was consistent with ANB's prior conclusion, it transferred the funds.

Latham further testified that ANB had not suspended or terminated any accounts held by LIMC or by Hollan or any lending arrangements involving them and that ANB had no idea whether SOT's request to transfer the funds in October 2020 caused any financial loss for LIMC or Hollan but that the transfer request did not cause ANB to take any adverse action against either of them. He also denied that any of the SOT Parties had made defamatory remarks to ANB about LIMC or Hollan.

On July 13, 2021—after the trial court severed GTH Holdings—Hollan testified that no accounts in his name were closed or terminated by ANB but that GTH Holdings's loans and transactions with ANB had been affected.

Because the SOT Parties affirmatively showed that there was no causation and no damages to support a tortious-interference claim by LIMC and Hollan—whether with an existing contract or with prospective business relations—the trial court did not err by granting summary judgment on this claim, *see id.*, and we overrule this portion of LIMC's third issue.

### d.  Abuse of process

LIMC argues that there remains a fact issue on its abuse-of-process claim,[40] one element of which is that the plaintiff sustained damage from the improper use of process. *See Kute Bar, LLC v. Tran*, No. 02-24-00119-CV, 2024 WL 4562500, at *5 (Tex. App.—Fort Worth Oct. 24, 2024, no pet.) (mem. op.) (reciting elements). As set out above, the SOT Parties' summary-judgment evidence showed that LIMC did not suffer any damage from ANB's release of funds (and our resolution of LIMC's first two issues likewise reflect the ultimate lack of harm). Accordingly, we overrule the remainder of LIMC's third issue.

### 3. ILS Parties' summary judgment

In its fourth issue, LIMC contends that because the Administration Agreement never terminated, its indemnification provision remains in effect, and that the trial court's judgment on the ILS Parties' motion is unsupported by the summary-

---

[40]Although LIMC complains that summary judgment was also improper on its wrongful-execution claim, it did not provide any argument or citations to authorities and the record on this sub-issue. Accordingly, we need not address it. *See* Tex. R. App. P. 38.1(i), 47.1.

judgment evidence. LIMC further argues that the ILS Parties never proved breach of contract as a matter of law. LIMC conceded in the trial court its lack of a money-had-and-received claim against the ILS Parties in its omnibus response.[41]

### a. Indemnification

The ILS Parties moved for summary judgment on LIMC's indemnity claim, which—based on LIMC's pleadings—relied entirely upon the second sentence of Article 4 of the Administration Agreement (set out in italics):

> 4.      Indemnity by Manager and Policy LLC. Manager and each Policy LLC (jointly and severally) will indemnify, defend and hold Administrator harmless against loss or damage deriving from any claim, demand, action, judgment, or other enforcement action from any person, entity, governmental or regulatory authority (whether state or federal), arising from act, omission, or forbearance of the current Manager or any previous Manager or any employee, agent, representative of such Manager or Policy LLC during such Manager's management of the affairs of the Policy LLC. *Manager and each Policy LLC (jointly and severally) will further indemnify, defend and hold Administrator harmless against reasonable and necessary expenses, costs, obligations and fees (including court costs and attorneys' fees) that Administrator may incur in defending or evaluating claims, demands, actions, judgments, penalties or enforcement actions brought by any person, entity, governmental regulatory authority (whether state or federal) and in enforcing this Agreement.* Manager and each Policy LLC will be responsible for providing liability insurance to Administrator at the Manager or Policy LLC's cost and expense.

In the trial court, the ILS Parties argued that LIMC's relied-upon portion of Article 4 was unenforceable as a matter of law because it failed to meet fair-notice

---

[41]Contrary to its representation in the trial court, on appeal, LIMC appears to argue that fact issues remain on its money-had-and-received claim against ILS and Blackburn. To the extent LIMC complains that the trial court erred by granting summary judgment on this claim, we overrule this part of its fourth issue as unpreserved. *See* Tex. R. App. P. 33.1.

requirements and subjected them to "limitless" indemnification "apparently regardless of fault," resulting in an "extraordinary and unlimited shifting of risk to the Manager." LIMC responded by relying on Business Organizations Code Sections 8.005 and 8.051 to support its argument that the indemnification provision was exempted from the express-negligence doctrine. LIMC does not rely upon or discuss either of these statutory provisions in its appeal. Accordingly, we will not consider them as a possible basis to reverse the trial court's judgment. *See* Tex. R. App. P. 33.1, 38.1, 47.1.

Instead of the arguments that it raised in the trial court, LIMC now argues for the first time that the fair-notice requirements do not apply because the clause, in its entirety, did not purport to shift the risk of LIMC's own negligence and that the first and second sentences must be read together to show that the first sentence provides indemnification for damages from a claim and the second sentence provides for fees and costs incurred in defense of that claim. LIMC further argues that "[b]ecause the ILS Parties failed to prove as a matter of law that the indemnification provision in the Administration Agreement was unenforceable," the trial court's summary judgment in their favor was improper. In a footnote, LIMC also argues—unlike its argument in the trial court—that Article 4 complies with the fair-notice conspicuousness requirement "to the extent relevant," because "it is set off in a separately numbered paragraph, indented, and the heading noting 'Indemnity' is underlined."

The ILS Parties respond that LIMC waived its new arguments because they were not in LIMC's summary-judgment response, *see* Tex. R. Civ. P. 166a(c); *D.R.*

72

*Horton-Tex., Ltd.*, 300 S.W.3d at 743,[42] and that the Texas fair-notice requirements apply to Article 4's second sentence. Regarding fair notice, the ILS and Lawler Parties argue that Article 4's second sentence—the only sentence relied upon by LIMC in its original and amended counterclaim and in its omnibus response—creates "a blank check" because it indemnifies the administrator for defending or evaluating claims brought by anyone for any reason, making it an extraordinary shifting of liability from LIMC to ILS.[43]

### (1) Fair notice

The fair-notice requirements include the express-negligence doctrine and the conspicuousness requirement. *Bell Helicopter Textron Inc. v. Hous. Helicopters, Inc.*, No. 2-

---

[42]The ILS Parties also argue that LIMC's new construction nullifies its claims against ILS because all claims for which LIMC sought indemnity in this case concerned claims based on acts and omissions that occurred *after* ILS had stopped managing the Policy LLCs such that the indemnity clause's first sentence—on its face—does not apply. According to them, under LIMC's new interpretation, if the second sentence applies only to the same claims in the first sentence, "then *none* of the claims in this case fall within the ambit of Article 4" because all claims pleaded against LIMC in this case "(1) concern LIMC's *own* conduct as Administrator and (2) arose well after the Administration Agreement was executed, which LIMC contends 'divest[ed] all management and control of the [Policy LLCs]' from ILS and placed it in the hands of LIMC as Administrator." [Emphases added.] We need not reach the temporal aspect of these arguments based on our resolution below. *See* Tex. R. App. P. 47.1.

[43]In its omnibus response, in arguing the applicability of Article 4's second sentence, LIMC stated that it "has been sued in these proceedings[] and has been required to defend itself against claims by the Movants[] for declaratory relief involving the enforcement and interpretation of the Administration Agreement[,] claims for breach of contract, and other claims falling squarely within the broad scope of the indemnity provision." LIMC thus acknowledged that it was seeking indemnity for claims based on its own actions, which were alleged to be wrongful.

09-316-CV, 2010 WL 3928741, at *2 (Tex. App.—Fort Worth Oct. 7, 2010, pet. denied) (mem. op.) (citing *Enserch Corp. v. Parker*, 794 S.W.2d 2, 8 (Tex. 1990)). "A contract which fails to satisfy either of the fair notice requirements when they are imposed is unenforceable as a matter of law." *Storage & Processors, Inc. v. Reyes*, 134 S.W.3d 190, 192 (Tex. 2004).

Indemnification of a party for its own negligence is an extraordinary shifting of risk for which the law applies fair-notice requirements. *Bell Helicopter*, 2010 WL 3928741, at *2 (citing *Dresser Indus., Inc. v. Page Petroleum, Inc.*, 853 S.W.2d 505, 508 (Tex. 1993)).[44] The express-negligence doctrine states that a party seeking indemnity from the consequences of its own negligence must express that intent in specific terms within the contract's four corners. *Id.* at *2 (citing *Ethyl Corp. v. Daniel Constr. Co.*, 725 S.W.2d 705, 707–08 (Tex. 1987)). The supreme court established this test to cut through the ambiguity of indemnity provisions, thereby reducing the need for satellite litigation regarding indemnity-clause interpretation. *Pioneer Energy Servs. Corp. v. Burlington Ins. Co.*, No. 14-18-00879-CV, 2020 WL 6325958, at *2 (Tex. App.— Houston [14th Dist.] Oct. 29, 2020, pet. denied) (mem. op.) (citing *Ethyl Corp.*, 725 S.W.2d at 708).

---

[44]The same public policy concerns associated with such extraordinary risk-shifting might apply with equal or greater force to intentional acts such as torts and breach of contract, *see Hamblin v. Lamont*, 433 S.W.3d 51, 57 (Tex. App.—San Antonio 2013, pet. denied), but we need not decide that question here. *See Storage & Processors, Inc.*, 134 S.W.3d at 192.

The conspicuousness requirement mandates that something must appear on the face of the contract to attract the attention of a reasonable person who looks at it. *Bell Helicopter Textron Inc.*, 2010 WL 3928741, at *2. Language may satisfy the conspicuousness requirement by appearing in larger type, contrasting colors, or otherwise calling attention to itself. *Storage & Processors, Inc.*, 134 S.W.3d at 192 (citing *Littlefield v. Schaefer*, 955 S.W.2d 272, 274–75 (Tex. 1997)).

We construe indemnity agreements under the normal contract-construction rules, *Ayres Welding Co. v. Conoco, Inc.*, 243 S.W.3d 177, 180 (Tex. App.—Houston [14th Dist.] 2007, pet. denied), and compliance with both fair-notice requirements is a question of law, *Dresser Indus., Inc.*, 853 S.W.2d at 509.

### (2) Analysis

The first sentence of the indemnity clause in the Administration Agreement indemnifies the Administrator from loss or damage from "any" claim by "any" person, entity, or governmental authority "arising from act, omission or forbearance of the current Manager or any previous Manager *or any employee, agent, representative of such Manager* or Policy LLC during such Manager's management of the affairs of the Policy LLC." [Emphasis added.] Because "any" person or entity could include LIMC, who became an agent or representative of the Manager under the Administration Agreement, the indemnity clause applied to LIMC's own negligence without explicitly saying so. *Cf. Gulf Ins. Co. v. Burns Motors, Inc.*, 22 S.W.3d 417, 423–24 (Tex. 2000) (holding that indemnification clause providing indemnity "except to the extent the

75

Agent has caused, contributed to or compounded such error" did not contemplate agent's indemnification from the consequences of his own negligence). The second sentence likewise provided that LIMC would be indemnified by ILS and the Policy LLCs against expenses, costs, and attorney's fees that it "*may* incur in defending or evaluating claims . . . brought by *any* person, entity, governmental regulatory authority . . . and in enforcing this Agreement." [Emphases added.] LIMC's counterclaims sought to enforce the Administration Agreement.

Regarding the conspicuousness aspect, the supreme court has stated that for indemnity agreements that relieve a party in advance for responsibility for its own negligence, the clause is conspicuous "[w]hen a reasonable person against whom a clause is to operate ought to have noticed it" because of, among other things, language in capital headings or in contrasting type or color. *Dresser Indus., Inc.*, 853 S.W.2d at 511 (stating that release provisions located on the back of a work order in a series of numbered paragraphs without headings or contrasting type were not conspicuous when the contracts were not so short that every term had to be considered conspicuous). In the five-page contract (not counting exhibits), the only clause to distinguish itself from its siblings by using all capital letters was the one on forum selection and the contract's governing law. The rest of the contract's clauses— including the indemnity clause—all appear with the same font size and heading type. Unlike the forum-selection clause, nothing here set the indemnity clause off from any

76

other part of the Administration Agreement. *See id.*; *see also Bell Helicopter Textron Inc.*, 2010 WL 3928741, at *2.

Accordingly, under either the full clause or its second sentence, the trial court did not err when it granted summary judgment to the ILS Parties on LIMC's indemnification claim, and we overrule this portion of LIMC's fourth issue.

### b. Breach of contract

In the remainder of its fourth issue, LIMC complains that because the ILS Parties failed to establish that the indemnification provision was unenforceable, they were not entitled to summary judgment on their breach-of-contract claim based on that provision, i.e., LIMC's withholding of funds based on its indemnification claim. The corollary defeats this claim: because the indemnity provision was unenforceable as a matter of law, LIMC had no basis to retain the funds and thus breached the contract. We overrule the remainder of LIMC's fourth issue.

### 4. Lawler Parties' summary judgment

In its fifth issue, LIMC asserts that the trial court erred by granting the Lawler Parties' summary-judgment motion because—as argued in its fourth issue—the indemnification provision "is valid and enforceable as part of the Administration Agreement." As set out above, because the indemnification provision was unenforceable and LIMC thus had no right to retain the Lawler Parties' funds, we overrule LIMC's fifth issue without considering LIMC's remaining arguments or the ILS and Lawler Parties' waiver arguments. *See* Tex. R. App. P. 47.1.

77

**E. Prejudgment interest**

Prejudgment interest is compensation allowed by law as additional damages for lost use of money due as damages during the lapse of time between the claim's accrual and the date of judgment. *Ventling v. Johnson*, 466 S.W.3d 143, 153 (Tex. 2015) (citing *Johnson & Higgins of Tex., Inc. v. Kenneco Energy, Inc.*, 962 S.W.2d 507, 528 (Tex. 1998) (op. on reh'g)). The failure to object to a prejudgment-interest award in the trial court waives the issue for appeal. *Heatley v. Red Oak 86, L.P.*, 629 S.W.3d 377, 396 (Tex. App.—Dallas 2020, no pet.).

In its final issue, LIMC complains that the "evidence shows that the [SOT Parties] were not deprived of the use of any disputed funds during the course of the underlying litigation given that they undertook to usurp control of the funds in the ANB Account in October 2020." LIMC asserts that "[t]o the extent prejudgment interest is allowed, it should be calculated only from the initial notice of this action to October 16, 2020[,] when the [SOT Parties] took control of the funds."

The SOT Parties respond—among other arguments—that LIMC waived any objection to the award or the calculations used to arrive at it, directing us to the portion of the record showing that they provided LIMC and Hollan with their proposed calculations and substantiating documentation, that LIMC and Hollan's counsel responded that he was "in agreement" with the proposed calculations, and that the trial court admitted into evidence, without objection by LIMC and Hollan, the email showing this agreement, along with the prejudgment-interest calculations at

78

the new-trial hearing. We conclude that LIMC has waived this issue. *See Mortell v. Scott*, No. 01-23-00018-CV, 2024 WL 5249086, at *12 (Tex. App.—Houston [1st Dist.] Dec. 31, 2024, no pet.) (mem. op.) (discussing waiver). We overrule LIMC's final issue without reaching the SOT Parties' remaining arguments. *See* Tex. R. App. P. 47.1.

**F. Cross-appeal**

In their two issues on cross-appeal, the SOT Parties argue that the trial court erred by eliminating Hollan's liability on their conversion and money-had-and-received damages and attorney's fees on their declaratory-judgment claims. The SOT Parties assert that personal liability was proper because Hollan's personal actions made him a joint tortfeasor with LIMC and that Hollan's requests to eliminate all personal liability on his part were improperly and untimely raised. They further argue that the alleged legal basis argued by LIMC and Hollan—that the SOT Parties did not pierce LIMC's corporate veil—was not relevant to the attorney's-fee award under the DJA.[45]

LIMC responds that the SOT Parties failed to argue or offer evidence to support imposing personal liability on Hollan in their August 31, 2021 summary-judgment motion or in their response to LIMC's motion to reconsider. Specifically,

---

[45]Regarding the SOT Parties' arguments about untimeliness, the trial court retains continuing control over interlocutory orders and has the power to set those aside any time before a final judgment is rendered and then retains plenary power over its judgment until it becomes final, during which time it may grant a new trial or vacate, modify, correct, or reform the judgment. *In re Panchakarla*, 602 S.W.3d 536, 539–40 (Tex. 2020) (orig. proceeding).

LIMC complains that the SOT Parties never offered any evidence that Hollan had personally directed or committed the conduct at issue for the conversion and money-had-and-received claims, that there is no evidence to support his personal involvement in handling the allegedly converted funds, and that the declaratory relief was based on the Operating and Administration Agreements, to which Hollan was not a party. As to the declaratory-judgment claims, then, "[i]t was well within the District Court's discretion to thus determine that Hollan should not be individually liable for any attorneys' fees accrued in connection with the declaratory action."[46]

The SOT Parties reply that there was adequate evidence to support summary judgment against Hollan regarding his control over LIMC and direction of its activities, including the acts of conversion. They further argue that having previously determined that Hollan was liable on the state-law claims and having decided that the SOT Parties were entitled to attorney's fees on their declaratory claims, "it was an abuse of discretion for the [trial court] to shield Hollan from liability for those fees without any stated justification."

---

[46]In its cross-appellee's brief, LIMC challenges the sufficiency of the evidence to support the trial court's $176,221.08 award and argues that the evidence shows that LIMC "was likely only in possession of approximately $141,221.08" because the SOT Parties failed to establish that they were entitled to the $35,000 paid out separately for close-out costs. LIMC did not raise this complaint in its appellant's brief and never presented any evidence in the trial court to support that the $35,000 pay-out to an accountant was "necessary, appropriate, or advisable" under the Administration Agreement, and as set out above, Hollan testified that some of the $35,000 could have stayed with LIMC, and the bank statement showed payment of $35,000 to the same account as the $141,221.08.

The record reflects that in their live pleading, SOT and Bonham sued Hollan, "an individual" and LIMC's "manager, agent, and principal." SOT and Bonham sought declarations that if what was left of the policy proceeds was insufficient, then "Defendants shall be jointly and severally liable to pay the outstanding amounts owed to" them. In their (pleaded) conversion claim, SOT and Bonham asserted, "Defendants have converted special deposits that are owed to Plaintiffs," and in their (pleaded) money-had-and-received claim, they asserted, "This claim for money had and received is pled in the alternative to Plaintiffs['] declaratory judgment claims."

In their third summary-judgment motion, as discussed above, the SOT Parties raised unpleaded conversion and money-had-and-received claims for "another $176,221.08 . . . that Defendants improperly took as putative administrative fees when LIMC admits it was already paid in full on its administrative fees."

## 1. Joint and several liability

"Under well-settled Texas common law, individuals are *personally* liable for torts they commit as corporate agents." *Keyes v. Weller*, 692 S.W.3d 274, 275 (Tex. 2024) (emphasis added). Piercing the corporate veil is merely a method to impose personal liability on shareholders and corporate officers who would otherwise be shielded from liability for corporate debts—a form of vicarious liability. *Id.* at 278–79; *see Transcor Astra Grp. S.A. v. Petrobras Am. Inc.*, 650 S.W.3d 462, 478 (Tex. 2022) ("[T]he fact that an individual was acting in a corporate capacity does not prevent the individual from being held personally—or 'individually'—liable for the harm caused by those acts.");

81

*see Landers v. E. Tex. Salt Water Disposal Co.*, 248 S.W.2d 731, 734 (Tex. 1952) (explaining joint-and-several liability generally as "[w]here the tortious acts of two or more wrongdoers join to produce an indivisible injury, . . . all of the wrongdoers will be held jointly and severally liable for the entire damages and the injured party may proceed to judgment against any one separately or against all in one suit"); *see also Lone Star Mining Co. v. Texeramics, Inc.*, 363 S.W.2d 868, 870 (Tex. App.—Eastland 1962, writ ref'd n.r.e.) (holding company's president individually liable with his corporation when he testified that the gate, the lock, and the "keep out" signs were put up on the property at his instruction).

As set out above, the record reflects that Hollan, acting for LIMC, committed both the pleaded and unpleaded tort of conversion with LIMC. Because there was no basis to remove joint-and-several liability from Hollan for conversion, we sustain this issue and render judgment that Hollan is jointly and severally liable for the conversion claims. *Cf. Norhill Energy LLC*, 517 S.W.3d at 917 (explaining that money had and received is "equitable in nature").

## 2. Attorney's fees under the Declaratory Judgments Act

Under the DJA, the trial court "*may* award costs and reasonable and necessary attorney's fees as are equitable and just." Tex. Civ. Prac. & Rem. Code Ann. § 37.009 (emphasis added); *see Castille v. Serv. Datsun, Inc.*, No. 01-16-00082-CV, 2017 WL 3910918, at *11 (Tex. App.—Houston [1st Dist.] Sept. 7, 2017, no pet.) (mem. op.) ("[T]he DJA does not require an award of attorney's fees."). We review an award of

82

attorney's fees under the DJA for an abuse of discretion. *Bocquet v. Herring*, 972 S.W.2d 19, 21 (Tex. 1998) (noting that a court may conclude that it is not equitable or just to award even reasonable and necessary fees). "Equity and justice in the context of [S]ection 37.009 are questions of law committed to a trial court's broad discretion in light of all the circumstances." *Anglo-Dutch Petroleum Int'l, Inc. v. Greenberg Peden, P.C.*, 522 S.W.3d 471, 497 (Tex. App.—Houston [14th Dist.] 2016, pets. denied). Because the award is within the trial court's discretion, it will not be reversed on appeal absent a clear showing of an abuse of discretion. *Castille*, 2017 WL 3910918, at *11 (noting that, under the DJA, the trial court may decline to award attorney's fees to either party).

The final judgment reflects that the trial court considered the SOT Parties' January 26, 2022 motion for entry of final judgment and award of attorney's fees and expenses against LIMC and Hollan, "including all supplements thereto," and "each and any responses thereto, the parties' supporting briefs, submissions, the other pleadings and papers on file in this case, and the argument of counsel, and applicable law." Because the trial court did not specify on what basis it removed Hollan's liability for the attorney's-fee award under the DJA and because the trial court had the discretion to award all, some, or none of the SOT Parties' requested attorney's fees under the DJA in light of all the circumstances, *see Anglo-Dutch Petroleum Int'l, Inc.*, 522 S.W.3d at 497, without more, we cannot say that its decision to make LIMC solely liable for the attorney's fees under the DJA amounted to a clear abuse of discretion,

particularly when LIMC and Hollan argued in their motion to reconsider that imposing personal liability on Hollan would be inequitable and unjust in addition to their lack-of-piercing-the-corporate-veil argument. We overrule the SOT Parties' second issue.

## IV. Conclusion

We have overruled all of LIMC's issues and the SOT parties' second issue in their cross appeal. Having sustained the SOT Parties' first issue in their cross appeal, we render judgment that Hollan is jointly and severally liable on the SOT Parties' conversion claims. We affirm the remainder of the trial court's judgment.

/s/ Wade Birdwell

Wade Birdwell
Justice

Delivered: August 7, 2025